ST. LOUIS SOUTHWESTERN RAILWAY CO. v. FRANCES W. FARRELL ADM'X OF THE ESTATE OF MARGUERITE M. BOOTH

5-4184                                                    416 S. W. 2d 334

Opinion delivered June 5, 1967

[Rehearing denied. July 26, 1967.]

*Barrett, Wheatley, Smith & Deacon,* for appellant.

*Shaver & Shaver,* for appellee.

CARLETON HARRIS, Chief Justice. This appeal involves a railroad crossing accident. Frances W. Farrell, Administratrix of the Estate of Marguerite M. Booth, instituted suit against the St. Louis Southwestern Railway Company, seeking damages because of the death of Mrs. Booth, who succumbed on June 4, 1964, as a result of injuries suffered on June 1, 1964, when an automobile in which she was riding struck the third power unit of a Cotton Belt train at a crossing near the Fair Oaks community in Cross County. On trial, the jury returned a verdict for $70,000.00 against the railroad company, appellant herein, and from the judgment so entered comes this appeal. For reversal, it is asserted, first, that there was no submissible issue of negligence, and a verdict should have been directed for the Cotton Belt. In the alternative, it is contended that the court erred in refusing a requested instruction by appellant dealing with increasing care commensurate with danger.

Let it first be stated that the questions of negligence involving employees charged with operating the train, in such matters as speed of the train, ringing of the bell, blowing of the whistle, and maintaining a proper lookout, are not really involved in this appeal. The trial court dismissed the complaint against the conductor after the plaintiff had concluded its case, and dismissed

the complaint against the engineer following the conclusion of all the evidence.[1] While appellee[1A] cross-appeals from the trial court's action in dismissing the complaint against the engineer, only two paragraphs are devoted to this cross-appeal, and appellees state that they are not insisting on same "unless it should become important in this matter and we have mentioned same so that no waiver could be inferred." There is no reason to relate the testimony relative to any alleged negligence on the part of this employee, and it will suffice to say that an examination of the record supports the order entered by the Circuit Court dismissing the complaint as against him.

The main premise on which recovery was sought, and the one upon which the jury granted the recovery, was that the Fair Oaks crossing is an abnormally dangerous crossing and the railroad had not provided adequate warnings of the approach of trains.

The accident occurred at 8:35 A.M. on June 1. G. C. Booth, accompanied by his wife, Marguerite, was driving east on Highway No. 64, and the Cotton Belt train, consisting of five power units, seventy-two cars, and a caboose, was proceeding south at a speed of 60 to 65 miles per hour. The crossing was equipped with standard flashing signal lights, a bell, and an electric signal, which showed a constant vertical red S-T-O-P once the signals were activated by an approaching train. The Booth automobile, according to the evidence, skidded approximately 77½ feet into the third power unit of the train, killing Mr. Booth instantly and fatally injuring Mrs. Booth. The highway was straight, level, and at grade with the crossing. A motorist's view toward the direc-

[1]The complaint against Gerald Slocum, a signal maintainer for the railroad company was also dismissed at the conclusion of the plaintiff's case. (The Fair Oaks crossing was located in the district in which Slocum was charged with the responsibility of maintaining signal lights.)

[1A]Since all of the heirs are the real parties in interest, appellee will hereafter be referred to in the plural.

tion from which the train was approaching is obstructed by a store building, surrounded by a grove of trees, the east edge of the building being located about 75 feet from the railroad track. The sun was in the east, which, as stated, was the direction in which the automobile was proceeding. All of the evidence is to the effect that the flasher lights were working, but appellees offered numerous witnesses who testified that the lights appear dim and difficult to see when one is driving toward the sun. There was also testimony that there are trees on the railroad right-of-way that obstruct the view of a motorist traveling east, preventing such motorist from seeing an approaching train, at least during the period of time when the trees are in full foliage.

Albert Hess, who lives three miles east of Fair Oaks, testified that as one travels east early in the morning in June, the sun is about eye level; that the signal lights could very easily be overlooked, appearing dim because of the sun. This witness testified that at a time when a state trooper's patrol car was parked at the crossing with the patrol light on, he observed that that light was much brighter than the railroad signal lights.[2] Harold E. Cox, who resides a mile from the Fair Oaks crossing, stated that at certain times of the year when the sun is bright, the lights are difficult to see. This, according to the witness, is particularly true with reference to early morning travel to the east and late afternoon travel toward the west. Otha Hewitt, Chief of the Traffic Service Division of the Arkansas Highway Department, testified that early in the morning and late in the afternoon, the sun is at an angle that makes it difficult to see the lights at the Fair Oaks crossing. The Chancery Judge of the Fifth Chancery District, Ford Smith, who frequently travels over the crossing involved, said that as one travels from the west toward the east, between 7:30 and 8:30 in the morning, the glare of the sun creates difficulty in ascertaining whether the lights are blinking, and this witness also stated that

[2]This comparison was made when both the railroad lights, and the police patrol light were on (flashing).

the growth of trees, heretofore referred to, makes it difficult to observe a train approaching from the north.

Jimmy Brannan, a Highway Department resident engineer, made measurements on the railroad right-of-way for the purpose of ascertaining the type, size and density of timber growing on the right-of-way. He testified that a number of trees were at least partly on the railroad right-of-way, including some that, from their size, appeared to be about ten years old. Brannan made measurements for a distance of 1,000 feet north of the crossing, and he stated that the timber was not in a continuous line, but was "intermittent, skips." This witness also testified that the crossing lights were difficult to see when driving into the sun.

A total of nine witnesses testified that (to varying degrees) the sun definitely affected the ability of an approaching motorist to see the flashing signals at the crossing. There was also testimony by some other witnesses that the signals could be seen, but we are here only concerned with whether there was sufficient evidence to send the case to the jury.

The court was asked to submit to the jury the question of whether the crossing in question was "abnormally dangerous" and, over the objections of appellant, the following instruction was given:

"Plaintiff, Frances W. Farrell, Administratrix, contends that the Railroad grade crossing in this case was abnormally dangerous, and they have the burden of proving this proposition.

"If a Railroad grade crossing is frequently used by the traveling public, if trains pass over it frequently, and if the crossing is so dangerous because of surrounding circumstances that a reasonably careful person could not use it with reasonable safety in the absence of special warnings, then it would be an abnormally dangerous

crossing. Whether the Railroad grade crossing in this case was abnormally dangerous is for you to decide.

"If you find that the crossing was abnormally dangerous, as I have defined that term, then it is the duty of the railroad to use ordinary care to give a warning reasonably sufficient to permit the traveling public to use the crossing with reasonable safety."

The railroad contends that it had given special warnings (the signal lights), and that the signal system used meets the standards set by the American Association of Railroads, as adopted by the Bureau of Public Roads, and the Arkansas Highway Department. As to the last argument, let it be said that a railroad's compliance with safety regulations (either industry or statutory regulations) does not constitute a complete discharge of its duties toward the public. *Pennington* v. *Southern Pacific Company*, 304 Pac. 2d 22 and *Bridger* v. *Union Railway Company*, 355 F. 2d 382 (1966). In the case of *Grand Trunk Railway Company of Canada* v. *Ives,* 12 Supreme Court 679, the United States Supreme Court said:

"*** The underlying principle in all cases of this kind which requires a railroad company not only to comply with all statutory requirements in the matter of signals, flagmen, and other warnings of danger at public crossings, but many times to do much more than is required by positive enactment, is that neither the legislature nor railroad commissioners can arbitrarily determine in advance what shall constitute ordinary care or reasonable prudence in a railroad company at a crossing, in every particular case which may afterwards arise; for, as already stated, each case must stand upon its own merits, and be decided upon its own facts and circumstances, and these are the features which make the question of negligence primarily one for the jury to determine, under proper instructions from the court."

Appellant insists that it had given special warnings, but it is the sufficiency of the warnings that is here in question. In our own case of *Fleming, Administratrix* v.

*Missouri and Arkansas Railway Company,* 198 Ark. 290, 128 S.W. 2d 986, we said:

"It is the settled rule that whether failure of a railroad company to station a flagman at a crossing constitutes an omission of such care as an ordinarily prudent person would use under the same or similar circumstances, is a question of fact where there are obstructions which materially hinder the view of approaching trains, provided the crossing is used frequently by the public, and numerous trains are run.[3] Inasmuch as permanent surroundings may create a hazardous condition, the rule of care goes further and requires precautions where special dangers arise at a particular time. It is said that the obligation exists, at an abnormally dangerous crossing, to provide watchmen, gongs, lights, or similar warning devices not only for the purpose of giving notice of approaching trains, but such care is to be equally observed where the circumstances make their use by the railroad reasonably necessary to give warning of cars already on a crossing, whether standing or passing, as where a crossing is more than ordinarily dangerous because of obstructions to the view interfering with the visibility of the responsible train operatives, or those approaching the track."

In *Hawkins* v. *Missouri Pacific Railroad Company, Thompson, Trustee,* 217 Ark. 42, 228 S.W. 2d 642, we said:

"*** A directed verdict for the defendant is proper only when there is no substantial evidence from which the jurors as reasonable men could possibly find the issues for the plaintiff. In such circumstances the trial judge must give to the plaintiff's evidence its highest probative value, taking into account all reasonable infer-

---

[3]The record reflects that a traffic count made about 0.25 miles east of the railroad at Fair Oaks on U. S. No. 64 for a 24-hour period showed a volume count on July 28, 1964, of 1,772 vehicles, and on August 3, 1964, of 1,957 vehicles. The record also further reflects an average of 16.4 trains per each 24-hour period during the month of June, 1964.

**764**

ences that may sensibly be deduced from it, and may grant the motion only if the evidence viewed in that light would be so insubstantial as to require him to set aside a verdict for the plaintiff should such a verdict be returned by the jury."

We think, under the testimony adduced, that the instruction was proper, and we hold that there was sufficient testimony to make a jury question as to whether the special warnings given were adequate to warn the occupants of the Booth car of the approach of the train.

It is asserted that reversible error was committed by the court in refusing to give appellant's Requested Instruction No. 1. This proposed instruction reads as follows:

"A motorist whose visibility is impaired, or reduced, by physical or natural elements is under the duty for his safety and that of others affected by his driving to exercise ordinary care commensurate with the increased dangers present or created by natural causes."

We do not agree. It will be noted that this instruction pertains only to the duty of the *motorist, i.e.,* operator of the vehicle, the instruction setting forth his duty to himself and "others who are affected *by his driving.*" Had this litigation been instituted by the administrator of *Mr. Booth's* estate, appellant's argument might be pertinent, but since the suit was instituted by the administratrix of the passenger, and in view of the court's Instruction No. 18, appellant's argument is without weight. The court, in Instruction No. 18, after telling the jury that Mrs. Booth was required to exercise ordinary care for her own safety, and a failure on her part to do so would be negligence, then stated, in this same instruction:

"On the other hand, the negligence, if any, of G. C. Booth in operating the automobile in which Marguerite M. Booth was a passenger prior to and at the time of the

fatal accident in this case *could not be imputed* [our emphasis] to Marguerite M. Booth or to the plaintiff in this case."

This instruction was given without objection on the part of appellant, thus precluding any possible error in the court's failure to give appellant's Requested Instruction No. 1.

It might also be stated that there was no evidence in this case which would have justified the court in giving an instruction on imputed negligence. See *Rogers* v. *Crawford*, 220 Ark. 385, 247 S.W. 2d 1005.

It is finally urged by appellant that the verdict was grossly excessive, and we agree that the evidence does not justify the amount of damages awarded. The complaint sought $50,000.00 for pain and suffering of the deceased who died four days after the collision; $4,000.00 was sought for medical, hospital, doctors, and burial expenses, $3,500.00 for the market value of the Dodge automobile that was demolished, and the three children of Mrs. Booth asked $50,000.00 for mental anguish. A general verdict only was returned by the jury, and we have no way of knowing how the $70,000.00 awarded was apportioned. We are firmly of the view, however, that the established facts do not justify the recovery of a large amount for mental anguish of the children. The surviving children were Fred Welsh, Morgan Welsh, and Frances Welsh Farrell, all children of Mrs. Booth by a previous marriage. The evidence reflects that Fred Welsh was 50 years of age, married, with three children, and lives in Cincinnati, Ohio, where he is manager of the Pepsi-Cola Bottling plant. He has not lived in Searcy for 30 years, but testified that his mother visited him in his home just before Thanksgiving 1963; he has not been in her home since Thanksgiving 1962. He stated that he frequently corresponded with his mother.

Morgan Welsh, 47 years of age, who manages a newspaper in De Land, Florida, testified that he had not lived in Searcy since 1941. He said that his mother, at

the time she was fatally injured, had started on a journey to his home for the purpose of attending the graduation of his son; further, that his mother would visit him in Florida every 2 or 3 years, and he more frequently visited her in Searcy. He had not seen her since the preceding Christmas.

Frances Welsh Farrell, 44 years of age, lives in Brinkley with her husband. Her testimony reflected that she contacted her mother by mail frequently, and called Mrs. Booth over the telephone nearly every Sunday. She had last seen her mother about a month before Mrs. Booth's death. Each child, upon being notified of the accident, went to Memphis, and was present there when the mother died. Each was, of course, shocked, upon learning of the tragedy, and each testified as to mental anguish suffered because of the death of Mrs. Booth. *Peugh* v. *Oliger, Administratrix*, 233 Ark. 281, 345 S.W. 2d 610, is our landmark case on mental anguish. The opinion discusses at length what constitutes "mental anguish," and points out that the term means "something more than recovery for the normal grief occasioned by the loss of a loved one. To be grieved or to be shocked by the death of a loved one is natural, but in order to recover under the Act No. 255, one must suffer more than the normal grief." In *Mode* v. *Barnett, Administratrix*, 235 Ark. 641, 361 S. W. 2d 525, three minor sons were awarded $7,500.00 each for the mental anguish caused by the wrongful death of their father, who had been shot and killed. From the opinion:

"*** In the instant case, we have three small boys who had been in close association with their father, probably a closer relationship than in the average family, due to the fact that there was no mother present to share in the companionship. Suddenly the one remaining parent was taken away from them — and in a violent manner. According to the evidence of Cecil Barnett, husband of Mrs. Clida Barnett, the boys' grandmother, the younger boys cried many nights, and on several occasions awakened the Barnetts in the middle of the night, 'There's

been a many of nights that me and my wife would go to bed, pick them up and take them in and love them and talk to them.' The witness states that Ferrell, one of the twins, had been under a doctor's care due to extreme nervousness. The boys testified that their father was good to them, and would take them fishing, swimming, and to the picture show. Mrs. Barnett stated, 'He took the boys everywhere he went when he wasn't working, and they were not in school. If he went anywhere, they were with him, because he didn't leave them behind. And he worshipped those boys.' She also testified that their father's death affected their school work: 'They were able to continue in school but they had to stay in that same grade that year. They had to stay in that grade two years.' "

See also *Strahan* v. *Webb*, 231 Ark. 426, 330 S.W. 2d 291, where two boys, one in college, and one still in high school, had close ties with their father, who was killed in a collision.

In *Peugh* v. *Oliger, supra,* Mr. and Mrs. Albert Henley and Mr. and Mrs. Eugene H. Eubanks were all killed in an automobile collision when the auto in which they were riding was involved in a collision with a truck. Separate suits were instituted by the administrators, respectively, of the two couples, and the suits were consolidated for trial. The jury returned a verdict for Mrs. Gene Frances Oliger for $12,500.00 for mental anguish for the death of her father, Mr. Eubanks, and a like amount for mental anguish occasioned by the death of her mother. The evidence reflected that Mrs. Oliger was very close to her parents, and worked with them nearly every day in the hardware store which they owned. She fainted upon learning of their deaths. Even with this close relationship, the aforementioned verdicts were reduced to $7,500 each. The jury also returned a verdict for mental anguish damages in the amount of $2,000.00 for each of the five children of Mr. Henley, because of his death. All five children lived in distant states. The judgments for two were reversed, and their causes dismissed, and the other three verdicts were reduced

to $500.00 each. An award of $10,000.00 for mental anguish was given Mrs. Leta Ring (because of the death of Mrs. Henley) who had been reared from early childhood by Mrs. Henley. After her marriage, Mrs. Ring continued to live near her, saw her every day, and subsequently, upon moving, would write and call her foster mother. The evidence reflected that upon the death of Mrs. Henley, Mrs. Ring suffered a near nervous breakdown. The award was left undisturbed by this court.

Here, the children seem devoted to their mother, and much closer to her than the five children of Henley, mentioned in *Oliger,* but, with the exception of the daughter, were rarely with her, and their contacts could not be termed "frequent," as the word is generally used. This, of course, is due to the fact that the two sons lived in states that were far away, and the opportunities for visiting were accordingly limited. Even Mrs. Farrell, who lived only 60 miles away, does not appear, from the record, to have visited with her mother a great deal, the principal contact being by letter, and once per week telephone calls.

Of course, these children were shocked when they learned of the fatal injury of their mother, and their grief was undoubtedly very real. Yet, we find nothing in this record that indicates that their grief was considerably greater than that of the normal and average adult child, who has lived away from home for many years. There are no exceptional circumstances, or particular relationships between the children and their mother, that would justify an unusual award. After all, death is a certain fact, and Mrs. Booth had reached that age when these children surely recognized the fact that their mother, in all probability, could not live too many more years. We have concluded that the judgment is grossly excessive, and should be reduced from $70,000.00 to $50,000.00.

Accordingly, the judgment is affirmed on the condition that a remittitur is entered as indicated within

seventeen calendar days; otherwise, the judgment will be reversed, and the cause remanded for a new-trial.

GEORGE ROSE SMITH, J., dissents.

FOGLEMAN, J., concurs.

GEORGE ROSE SMITH, Justice, dissenting. I think the judgment should be reversed and the cause remanded for a new trial.

Among the instructions given was AMI 1805, which, after defining an abnormally dangerous crossing, goes on to say that if the jury finds that the crossing was abnormally dangerous then it was the duty of the railroad to use ordinary care to give a warning reasonably sufficient to permit the traveling public to use the crossing with reasonable safety.

Evidently the jury found that the crossing was unduly hazardous, for the single reason that the rising or setting sun tends to blind motorists approaching the crossing. It thus became the railroad's duty to take extra precautions to warn travelers of the danger ahead. The railroad sought to discharge that duty by the installation of flashing red lights at the crossing. Under the court's instructions the decisive issue for the jury was whether the installation of those lights satisfied the railroad's obligation to give an adequate warning.

The only testimony bearing on that issue consisted of statements that the crossing lights appeared to be dim and a statement that the lights on a patrol car were much brighter than the crossing lights. It seems to me that this proof was so scanty that the jury was left to speculate about whether the crossing lights were reasonably calculated to meet the railroad's duty to warn. There is no proof that stronger or more visible lights can be bought or even that they can be manufactured. There is no proof that if brighter lights exist they would have overcome

the glare of the rising sun. There is no proof that patrol car lights are adaptable for use by the railroad. Those questions can be answered with a fair degree of certainty only by resort to skilled technical knowledge not lying within the ordinary experience of men called for jury duty. That knowledge was not made available to the jurors in the court below. Under the reasoning that we have followed in many cases, such as *Glidewell* v. *Arkhola Sand & Gravel Co.*, 21 Ark. 838, 208 S. W. 2d 4 (1948), and *Missouri Pac. R. R.* v. *Ross*, 194 Ark. 877, 109 S. W. 2d 1246 (1937), I am compelled to conclude that the jury was allowed to draw an inference of fact not based upon adequate proof—in short, to speculate.

JOHN A. FOGLEMAN, Justice, concurring, I concur in the result and agree that the case should not be reversed for failure to give appellant's requested Instruction No. 1, even though I think it is a correct declaration of law and applicable. But I believe that it affirmatively appears that no prejudice resulted because it was adequately covered by AMI 301, 303, 305 and 901. While there was no evidence on which negligence of G. C. Booth could be imputed to Marguerite M. Booth, appellant contended that the negligence of G. C. Booth was the sole proximate cause of her injuries. By these instructions the jury was told that ordinary care was the care a reasonably careful person would use *under circumstances similar to those shown by the evidence*; that it was the duty of all persons involved to use ordinary care for their own safety and *the safety of others*; that the lookout required of a driver of a motor vehicle was *that which a reasonably careful driver would keep under circumstances similar to those shown by the evidence*; that it was the duty of a driver of a motor vehicle to drive at a speed no greater than is reasonable and prudent, *having due regard for any actual or potential hazards;* and that *a failure to meet the standards of conduct required by the latter two rules was negligence.*