Harold AUSTIN, Appellee,

v.

**EUCLID–MEMPHIS SALES, DIVISION OF TRIPPEER ORGANIZATIONS, INC., Appellant.**

No. 20213.

United States Court of Appeals, Eighth Circuit.

Nov. 18, 1970.

Philip S. Anderson, Jr., Little Rock, Ark., for appellant.

Robert Chowning, Little Rock, Ark., for appellee.

Before VOGEL, MEHAFFY and LAY, Circuit Judges.

VOGEL, Circuit Judge.

This appeal is from a judgment based on a jury verdict of $12,000 in compensatory damages and $8,000 in punitive damages for alleged misrepresentation and willful deceit by the seller of a bulldozer-tractor. Federal jurisdiction is based on 28 U.S.C.A. § 1332.

Plaintiff-appellee, Harold Austin, is an experienced general construction contrac-

tor. During the course of his career he has purchased and owned twenty or more pieces of heavy-duty machinery which were used in his land-clearing work. This case arises out of his purchase of a bulldozer-tractor from defendant-appellant, Euclid-Memphis Sales.

In 1966 General Motors, the manufacturer of Euclid equipment, ordered that the tractor series previously designated C–6 would thereafter be referred to as series 82–30. These numbers usually appear on decals on the body of the tractor. Besides this designation each tractor has a serial number on a metal plate which is attached to the body. Generally, the older machines have lower serial numbers.

Plaintiff had purchased one used Allis-Chalmers tractor from the defendant prior to the contested transaction involved here and he also had owned one Euclid tractor. The latter was purchased from a private party in early 1968 and had a C–6 decal on its side and a relatively low serial number, 30898.

Originally, plaintiff had been looking at defendant's stock for a crawler-tractor. Several weeks after his initial visits he returned to Euclid-Memphis with the intention of buying a certain tractor which had a high serial number. That item had been sold but plaintiff further surveyed defendant's inventory. He examined but was displeased with one tractor which had a serial number of 30505 and marked with a C–6 decal. Defendant's salesman then said, "Look at this 82–30," calling attention to the tractor involved herein. It had been freshly painted and had on each of its sides 82–30 decals which were approximately 6 x 12 inches long. This tractor with a serial number 32791 was purchased by plaintiff. The salesman told the plaintiff that " * * * the 82–30 tractor was a newer model tractor than the C–6," which "they quit making in 1966." Defendant did not tell plaintiff the age of the tractor even after plaintiff's explicit request therefor. The sales invoice referred to a "[u]sed 82–30 Tractor S/N 32791." Plaintiff's wife drew the payment check on which she noted "[b]al in full for 82–30 tractor S/N 32791." Subsequently a third party expressed an interest in buying this piece of equipment from plaintiff and then for the first time plaintiff discovered that the tractor was originally a C–6 model and had been manufactured in 1962.

Apparently the defendant in refurbishing used tractors would replace the old C–6 decal with the newer 82–30 decal. The C–6 decals were no longer available after 1966.

Plaintiff paid $15,000 in cash for the tractor and also gave in exchange two used tractors and blades valued at approximately $19,000. In the transaction he received a 480-hour warranty on the purchased tractor as well as a new bulldozer blade which had a retail value of $4,000 to $5,000. Expert testimony indicated that the tractor purchased by the plaintiff was worth approximately $10,500 at the time of purchase and that if the tractor had actually been an 82–30 model made in 1966 instead of a C–6 made in 1962, it would have been worth "around $27,000.00."

Plaintiff alleged in his complaint that defendant "willfully, falsely and fraudulently represented to plaintiff that said tractor was a late 1966 or early 1967 used Euclid 82–30 Crawler Tractor of the value of $34,000.00" when in fact it was a Euclid C–6 tractor manufactured in 1962, having a value of $10,000. This allegedly was done with an intent to deceive and defraud plaintiff.

The case was presented to the jury on accurate instructions to which no exceptions were taken. The jury returned a verdict for the plaintiff. No question of the sufficiency of the evidence to justify a finding by the jury of fraudulent misrepresentation has been raised here.

On appeal defendant argues (a) that in denying its motion for a new trial the trial court misconceived the extent of its power and responsibility to insure that the amount of the judgment was not excessive and (b) that the verdict was so excessive that it constituted plain injus-

tice and either the judgment should have been modified or a new trial should have been granted. We consider these points separately.

As its first point, defendant contends that the issue on this appeal is not whether the trial court abused its discretion but whether or not it failed to exercise its discretion. Defendant argues that when the trial court denied the motion for a new trial it admitted that it was unaware of its power to order a remittitur of the award for punitive damages. Defendant thus concludes that in ruling on defendant's motion the trial court did not consider all aspects of the verdict as is required before this court may fairly rely on the exercise of the District Court's discretion. Among other things, the trial court stated:

"I think it was properly presented to the jury. * * * The jury obviously made its decision on the basis of the facts and the law as the Court gave by instructions. I do not think there could be any possible question raised about the responsibility of the jury, or the reasonableness of the jury's decision with reference to compensation under the facts presented in this case.

"As Mr. Chowning [attorney for plaintiff] said, it could have given under these facts compensatory judgment of $15,-000.00, but they didn't. They gave a judgment in that regard of $12,000.00. I do not feel that it would be proper for this Court to interfere with the judgment of the jury in that regard at all, either in the way of—I suppose you would say—threats for a new trial, or a suggestion for a remittitur. So there is a question in my mind of what authority has in that regard anyway now.

"So insofar as the judgment is concerned on compensatory findings, I don't think that I would even undertake to interfere with the jury.

"Now, with reference to the punitive damages given by the jury. I am simply not sure what, if anything, the Court can do with reference to that. I would be willing to receive any legal comments regarding the authority of the Court with reference to setting aside punitive damages. I doubt if this Court has any authority, frankly. I don't see that I would have any authority at all in that regard to require a remittitur.

"The jury, under the instructions of the Court, decided punitive damages, and I think that each of you are presuming when you say that a jury was trying to make the plaintiff whole, if we understand properly that term. I think we've got to assume that the jury was acting under the proper instructions; and the jury felt, apparently that under these instructions that the defendant was guilty of such action that caused them to have a clear conscience in that it should not be done—and that they are going to say to all other people, including the defendant, that it is not going to be done in the future.

"Who knows what is behind the thinking of a juror after you assume that the law has been followed, and the instructions of the Court have been heeded. So I do not feel that I have any authority whatsoever to interfere with this judgment on punitive damages.

"I have never had a comparable or similar case.

"MR. ANDERSON: [Attorney for the defendant] I would like to have permission to submit some authority to the Court that it can do so—that since the judgment under the verdict was broken up like it was that the Court would have the power, and that it is within the Court's discretion to sustain a verdict for compensatory damages and to set aside the verdict for punitive damages. I think it is purely discretionary, and if the Court would indulge me I would like to submit some authority within a few days.

"THE COURT: I'm not altogether sure it is discretionary with the Court in requiring any difference one way or the other—or in thinking that it is discretionary with the Court at this moment to set aside the verdict and order a new trial. *I do not intend to do that.* (Emphasis supplied.)

"Very frankly and candidly I think it was well tried and I stated that. *I don't believe that we should go to the expense of retrying this matter unless something should be shown to the Court that cannot be tolerated.* (Emphasis supplied.)

"In another case I did not set it aside, but I required a lawyer representing a client in Little Rock to enter a remittitur of $10,000.00 not too long ago because I actually felt in all candor that the judgment was excessive under the facts; but I have had the feeling since as to whether I was using the all-power of the Court in making him do that. *If there is abuse I would not hesitate to do it, but just to opportunely do it I cannot help it, I have some feeling there.*" (Emphasis supplied.)

"MR. CHOWNING: I would like to say this in conclusion,. Judge, that the case went to the jury with instructions on punitive damages. I think if you will recall my argument I did not particularly stress to the jury what they should do regarding punitive damages. I told them of the instruction on punitive damages, that they should listen to it, and if they believe the man was entitled to damages on the fact that was up to them— and I let it go right there.

"THE COURT: That's the way I recall it.

"MR. CHOWNING: And they listened to the instructions and they listened to the case and they decided they should award punitive damages; and I do not believe that jury was inflamed with passion, prejudice or anything else. They made a decision and I think it was a sound one.

"THE COURT: Gentlemen, I believe that under the circumstances, and notwithstanding your offer to file a brief in this regard, I will deny the motion. Might as well make some law on these subjects.

"If you gentlemen could agree on some modification as to the punitive damages I would not have any objection to your doing so. But I am going to leave it strictly up to you gentlemen after you've had an opportunity to think it over."

Neither party contests the well-established duty of the trial court to grant a remittitur or order a new trial in a jury case under the appropriate circumstances. See, Linn v. United Plant Guard Workers, 1966, 383 U.S. 53, 65–66, 86 S.Ct. 657, 15 L.Ed.2d 582; 6A Moore, Federal Practice, par. 59.05[3] at 3741–3742 (2d ed. 1966). Nor does either party question this court's authority to pass on the inadequacy or excessiveness of a jury award where there appears plain injustice or a monstrous or shocking result. See, Grunenthal v. Long Island R. Co., 1968, 393 U.S. 156, 157, n. 3, 89 S.Ct. 331, 21 L.Ed.2d 309; Clark v. Central States Dredging Co., 8 Cir., 1970, 430 F.2d 63, 67; Bankers Life & Casualty Co. v. Kirtley, 8 Cir., 1962, 307 F.2d 418, 423; Solomon Dehydrating Co. v. Guyton, 8 Cir., 1961, 294 F.2d 439, 447–448. The Supreme Court of Arkansas could also take such action. Willis v. Elledge, 242 Ark. 305, 413 S.W.2d 636 (1967); Holmes v. Hollingsworth, 234 Ark. 347, 352 S.W.2d 96 (1961). The sole question simply is whether or not the District Court was aware of and properly exercised its authority to insure that justice be done in regard to the amount of the judgment. See Chicago, Rock Island & Pacific R. R. Co. v. Melcher, 8 Cir., 1964, 333 F.2d 996, 1001.

■ We have examined with care the statements made by the trial court in denying defendant's motion. Although the language is not unambiguous, we conclude that the statement as a whole demonstrates that the District Court was fully aware of its power and authority to grant a remittitur as to either or both verdicts if in the exercise of its discretion it reasonably believed justice so required.

We think it certain that when Judge Harris said, "[s]o I do not feel that I have any authority whatsoever to interfere with this judgment on punitive damages," he was referring specifically to the facts of this case. He was indicat-

ing that under the unchallenged and accurate instructions of the court the jury's verdict was reasonable and that the court therefore had no power to interfere with the judgment on punitive damages. Judge Harris explained, "[i]f there is abuse I would not hesitate to do it, but just to opportunely do it I cannot help it, I have some feeling there." He expressly noted that in another case he had granted a remittitur of $10,000 " * * * because I actually felt in all candor that the judgment was excessive under the facts; * * *." These statements make it clear that Judge Harris was fully aware of his authority and that he did not abandon his prerogatives as a trial judge. Therefore, our reliance on his discretion is well-placed and required.

Defendant's second contention is that the verdict was so excessive that it constitutes plain injustice and that the motion for new trial or a modification of the judgment should have been granted.

As to the compensatory damage verdict of $12,000, the record indicates that there was expert testimony that the tractor purchased in August 1968 by the plaintiff was worth approximately $10,-500, whereas if it had in fact been an 82–30 model made in 1966 instead of a C–6 model made in 1962 it would have been worth approximately $27,000. As pointed out by the trial judge, a verdict of $12,000 for compensatory damages is well within the range of the competent testimony. It could not be disturbed as excessive.

The question of punitive damages was presented to the jury on defendant's own requested instruction. The instruction was clear and it properly entrusted the issue of punitive damages to the jury's discretion under appropriate guidelines. The trial judge found no abuse of the jury's discretion and accordingly denied the motion for a new trial or remittitur. We fully appreciate that under Solomon Dehydrating Co., supra, (involving strictly a compensatory verdict only) and Bankers Life & Casualty Co., supra, (involving addi-

tionally a verdict for punitive damages) that this court, if it found the verdict shocking or resulting in a miscarriage of justice or monstrous, could set the judgment aside or grant a remittitur or new trial. But here the punitive damage verdict of $8,000 bears some fair relationship to the compensatory damages which could have totalled as much as $15,000 but which the jury determined in the exercise of its discretion to be $12,000. As the trial judge properly instructed the jury, punitive damages may be imposed to punish a wrongdoer and to deter others from similar conduct. See Holmes v. Hollingsworth, supra, 234 Ark. 347, 352 S.W.2d 96, 100 (1961). A punitive damage verdict of $8,000 in the instant case is neither shocking nor a miscarriage of justice. Accordingly, the judgment is affirmed.