458 F.2d 639
 Mary Ellen SCOVILLE, Administratrix of the Estate of Thomas
W. Scoville, Jr., Deceased, Appellee,
v.
MISSOURI PACIFIC RAILROAD COMPANY, Appellant.
Robert KING, Administrator of the Estate of Angela King,
Deceased, Appellee,
v.
MISSOURI PACIFIC RAILROAD COMPANY, Appellant.
 Nos. 71-1129, 71-1130.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 20, 1971.
Decided April 12, 1972.
 
 Boyce Love, Little Rock, Ark., W. J. Smith, Little Rock, Ark., for appellant.
 Henry Woods, Little Rock, Ark., Sidney S. McMath, H. Allen Dishongh, Little Rock, Ark., for appellees.
 Before LAY, HEANEY and STEPHENSON, Circuit Judges.
 STEPHENSON, Circuit Judge.
 
 
 1
 Thomas W. Scoville, Jr., age 18, and Angela King, age 8, were killed when a Volkswagen automobile driven by Thomas, in which Angela was a passenger, was struck by the left front portion of a diesel locomotive owned and operated by the Missouri Pacific Railroad Company. The Scoville and King families instituted separate diversity actions in the United States District Court for the Eastern District of Arkansas seeking to recover damages for the wrongful deaths of their respective decedents. The cases were consolidated for trial to a jury. The railway appeals from judgments entered pursuant to verdicts of $60,000 in favor of Mary Ellen Scoville, Thomas' mother; of $12,500 in favor of Linda Scoville Smith, Thomas' sister; of $50,000 in favor of Mr. and Mrs. Robert King, the parents of Angela; of $7,500 each in favor of Robert King, Jr. and Tammy King, Angela's brother and sister; and of smaller amounts in favor of the estates of Thomas and Angela.
 
 
 2
 The accident took place at 5:00 p. m. the afternoon of May 29, 1968, at a public crossing three and one-half miles south of Little Rock, Arkansas. The crossing marks the point at which Missouri Pacific's main line intersects Vimy Ridge Road. The paved two-lane road is straight and level and runs generally north and south. The road is one which "feeds" into an interstate highway at some point north of the crossing. The defendant's four tracks, also straight and level, cross Vimy Ridge Road in generally an easterly-westerly direction. The tracks thus intersect the road at an angle of approximately ninety degrees.
 
 
 3
 The crossing is extensively used. The record discloses that it serves 1356 cars and 17 trains daily. It is guarded only by the standard cross-buck sign on the north and by a red stop sign on the south. The sign is said to be "occasionally up and occasionally down."[1]
 
 
 4
 A train approaching the crossing from the east, as this one was, comes out of a curve which ends some 2400 feet east of the crossing and then proceeds in generally a straight line across Vimy Ridge Road. Motorists approaching the crossing from the south, as Thomas was, must contend with certain obstructions and other conditions which are said to impair visibility both to the east and to the west, but perhaps more so to the west. These stem principally from two sources. First, pine and oak trees, weeds, high grass, and underbrush growing close to the tracks combine to form a grove, the effect of which is to complicate normal visibility. Second, the effect of the sun upon the vision of northbound drivers emerging from the grove is said to render detection of trains more difficult than usual. If the sun is shining from the west, as it was on the afternoon of the accident, a driver first looking in that direction experiences some difficulty in retaining normal focus on looking to the east. Additionally, there is a chain link fence on the east side of Vimy Ridge Road which parallels the road for a short distance not far from the crossing. There is testimony to the effect that the sun reflects against the fence in such a manner as to make it necessary for northbound motorists to continually blink in order to maintain normal focus.
 
 
 5
 The day of the accident was bright and clear. Thomas and Angela had been swimming that afternoon at the King's motel. They left the motel for Thomas' home so that he could dress for a baseball game in which he was to participate later that same day. Shortly thereafter, the record reveals that Thomas approached the tracks from the south at an approximate speed of 30 to 35 miles per hour and came to a firm stop very close to the southernmost rail about 10 seconds prior to impact; that Angela was looking to the east; that Thomas turned his head to the east; that the train, consisting of one diesel locomotive drawing eight empty cars, approached the crossing from the east at a speed of about 55 miles per hour;[2] that the locomotive engineer was seated on the north side of the engine cab with a clear view to the north but with no view whatsoever to the south and to the place at which Thomas had stopped his automobile; that at a point approximately 100 feet east of the crossing the fireman, positioned to the left of the engineer, exclaimed "automobile"; that the engineer then placed the train in "emergency position"; that the engine of the train struck the Volkswagen, causing it "to go into a spin and explode"; and that the engine proceeded 1716 feet past the crossing before coming to a stop. The collision was made possible because Thomas had "fouled" the tracks in permitting the front protion of his automobile to come to rest within two and one-half feet from the nearest rail.[3] There was evidence that the railroad failed to warn of the approach of its train as required by Arkansas statute.[4]
 
 
 6
 The railroad's motions for directed verdicts, made at the close of the plaintiffs' case and, again, at the close of all the evidence, were denied by the court.[5] The case was submitted to the jury on two specifications of primary negligence: (1) failure to sound the statutory warning, and (2) maintenance of an extrahazardous crossing. The issue of Thomas' contributory negligence also was submitted to the jury. After verdict the railroad filed its timely motions for judgment notwithstanding the verdicts and for a new trial. Both motions were denied.[6] The railroad urges here (1) that the trial court erred in submitting the case to the jury; (2) that Thomas' stop so close to the tracks must, as a matter of law, be deemed the proximate cause of the accident; and (3) that the several verdicts are excessive. We turn to these issues, having in mind that in such a case as this
 
 
 7
 "We are required to determine whether there is any substantial evidence upon which the verdicts for the plaintiffs could properly be based. For the decision of that question, we must assume as established all the facts that the evidence supporting the plaintiffs' claims reasonably tends to prove and that there should be drawn in the plaintiffs' favor all the inferences fairly deducible from such facts. * * * We must also give effect to the rule that issues that depend upon the credibility of witnesses, and the effect or weight of evidence are to be decided by the jury." Elzig v. Gudwangen, 91 F.2d 434, 439 (CA8 1937).
 
 
 8
 * We initially consider the contention that the evidence was insufficient to take the questions of the railroad's negligence to the jury.
 
 
 9
 1. Failure to sound the statutory warning. The railroad argues that the trial court erred in refusing to instruct the jury that
 
 
 10
 "When the presence of a train approaching or occupying a crossing is readily discoverable by means other than lights, signals or flag men, then the failure to have crossing lights, crossing signals or a flag man at the crossing and the failure of the train men to ring the bell or blow the whistle are not relevant factors for your consideration." (Emphasis supplied).
 
 
 11
 The theory upon which the railroad rests this claim of error is that a jury question as to the absence of the statutory signal was not presented; that this is so because the evidence establishes without room for argument that Thomas was fully cognizant of the approach of the train, with the consequence that, under appropriate Arkansas decisional law, the matter of signals does not become a legitimate jury consideration.
 
 
 12
 It is true that the Arkansas courts more than once have said that
 
 
 13
 "[T]he purpose of requiring a railroad to give signals is to warn the traveler of the approach of a train . . . [and] when the traveler otherwise has knowledge of the approach of the train, warning signals cease to be factors. Under those circumstances the failure to give the signals cannot be a proximate cause of the collision." Koch v. Missouri Pacific Railroad Company, Ark., 455 S.W.2d 858, 860 (1970).
 
 
 14
 But, as the dissent of Justice Fogleman in Koch points out, this rule has found application only in those cases where it can be said with assurance either (1) that the crossing was blocked by the train or, (2) that the injured party otherwise knew or must have known of the train's approach within sufficient time to act. 455 S.W.2d, at 860-861, and cases there cited. This, it seems to us, is but another manner of saying that it is only where the evidence affirmatively and clearly reveals that the ringing of the bell or the blowing of the whistle would not have produced a different result that the issue of signals is not a matter for the jury.[7]
 
 
 15
 The railroad insists that a conclusion that Thomas knew or must have known of the approach of the train is required from eye-witness testimony that his head was turned toward the direction from which the train was coming shortly before impact. We disagree. There is evidence from which the jury was entitled to infer that the approach to this crossing was made deceptive by reason of the foliage and underbrush growing closely thereto and, as well, because of the effect of the sun upon the vision of approaching motorists. The record also contains uncontradicted testimony to the effect that, for northbound motorists who approach the tracks in a Volkswagen, it is necessary, because of the underbrush and other conditions obscuring visibility, to stop at a point somewhat closer to the tracks than usual in order to experience complete visibility.[8] These probative facts, when considered with the testimony concerning the absence of the statutory warning and the questionable status of the stop sign, provide a solid basis from which the jury reasonably could infer that as he had a right to do, Thomas listened for the whistle,[9] and, the jury could find, hearing none, he, as he should have done, proceeded to the point from which he could effectively see in both directions and there stopped his vehicle. In this view, Thomas' stop so close to the tracks may be interpreted to mean that he did not know of the train's approach until it was too late to undertake protective action; that in stopping where he did he simply was being precautious of the obvious danger presented by the crossing; and that had he had the benefit of the statutory warning he would not have halted his vehicle at such a precarious point. From this hypothesis it must follow that the record does not contain the affirmative evidentiary support essential to justify the conclusion as a matter of law that Thomas' conduct would not have been significantly different had the warning been sounded within and during the time required by statute. While we may assume that the jury could properly have reasoned to the result pressed upon us by the railroad, we are unpersuaded by the suggestion that the decisional law of Arkansas mandates that result. We think, contrarily, that the plaintiffs introduced substantial evidence supportive of their theory on the warning issue and that it would have been error not to have submitted it to the jury. At best, uncertainty arises from the record as to the nature and effect of the conduct of all parties to the accident in the crowded events of the few moments preceding impact. That being so, not the court, but the jury, was the arbiter to determine the issue.[10] We therefore conclude that there was sufficient evidence to go to the jury on the question whether, as alleged in the complaint, the railroad was negligent in failing to sound the warning required by statute.[11]
 
 
 16
 2. Extrahazardous crossing. We are told by the railroad that in only three cases[12] has the Supreme Court of Arkansas approved "the abnormally dangerous crossing" instruction given in this case.[13] This may be so. Whether this fact should be a matter of dispositive concern to us depends solely upon an analysis of the distinctive facts present here.
 
 
 17
 Farrell, Jackson, and Hawkins, as well as Central Manufacturing Co. v. St. Louis-San Francisco Railway Company, 394 F.2d 704, 708-710 (CA8 1968) and Fleming v. Missouri & A. Ry. Co., 198 Ark. 290, 128 S.W.2d 986, 988 (1939) make clear that a railroad may be found negligent for its failure to give special warnings at a crossing which is rendered abnormally dangerous by reason of unusual circumstances or conditions. Questions as to the nature of the crossing and the adequacy of the particular warning devices there present are for the jury so long as the record evidence reasonably can be said to generate the issues. Our review of this record satisfies us that the evidence was sufficient and appropriate to take these questions to the jury.
 
 
 18
 The plaintiffs introduced evidence, without contradiction, that the Vimy Ridge crossing carried substantial automotive and railroad traffic.[14] We have noted the obstructions which are said to make it difficult for northbound motorists, especially those in Volkswagens, to detect approaching trains until close to the intersection. We have seen that the effect of the sun on the vision of northbound motorists further complicates normal visibility. Finally, it is clear that warning to vehicles approaching the crossing from the south consists only of a stop sign which sometimes is not erect, or if erect, not visible, and that there is no additional visual or physical protection or warning. In this posture of the record there is ample evidence for a jury to determine whether there were unusual or extraordinary circumstances rendering the crossing abnormally dangerous and, if so, whether the railroad was negligent in failing to warn by special devices. That is the governing consideration which requires a submission to the jury on this issue.
 
 II
 
 19
 In light of the foregoing analysis, it is clear that we believe jury questions as to the railroad's negligence were presented bearing on the giving of the statutory signal and on the extrahazardous nature of the crossing. But even conceding that it was negligent in either or both of these respects, the railroad insists that the serious question in this case is proximate cause. It would have us hold that Thomas' stop at a point where his vehicle could be struck by the ordinary overhang of the locomotive conclusively establishes as a matter of law that he was guilty of contributory negligence, and that this negligence supplied the sole proximate cause of the accident.[15] So to conclude would be to overlook certain principles which are firmly entrenched in the decisional law of Arkansas.
 
 
 20
 By definition, proximate cause in Arkansas is a cause which, in a natural and continuous sequence, produces damage and without which the damage would not have occurred.[16] The question ordinarily is for the trier of fact. The test of a jury case on the issue is simply whether reasonable men might differ as to whether an act or omission of the defendant is a proximate cause of the event in litigation.[17] It does not necessarily matter that, from the same evidence, the jury may also with reason, on grounds of proximate causation, attribute the result to the plaintiff's contributory negligence. This is so because under the Arkansas comparative negligence statutes, Ark.Stat.Ann. Secs. 27-1730.1 and 27-1730.2 (1957 Repl.), contributory negligence does not bar a plaintiff's recovery if it was "of less degree" than that of the defendant. Thus, as applied here, if both Thomas and the railroad were negligent, but the negligence of Thomas is less than that of the railroad, a recovery may nevertheless be had on Thomas' behalf so long as his damages are diminished by the jury in proportion to the amount of fault attributable to him.[18] The question of the comparative negligence of the parties is exclusively for the jury.[19]
 
 
 21
 From the evidentiary considerations detailed in Part I, we think it plain and clear that these plaintiffs met the test of a jury case on the issue of proximate cause. Within the Arkansas definition of that term, it was, from the evidence, open to the jury to find that the railroad failed to sound the statutory warning and/or failed to provide special warnings commensurate with the degree of risk extant at the crossing, and that this was negligence which in natural and continual sequence caused the injuries in suit. The point of principal importance is that while the questions of why Thomas stopped where he did, the significance of his stop at that point, and whether he had knowledge of the train's approach are susceptible to various answers, all somewhat conjectural because of the nature of the evidence, reasonable minds might disagree as to the inferences bearing upon causation derivable from the conduct of both Thomas and the railroad. Some of these support the railroad's claims and others plaintiffs'. For us, it is the debatable quality of this issue, the fact that reasonable minds could differ, that emphasize the appropriateness of leaving the question to the jury.
 
 
 22
 The issues of primary negligence, contributory negligence, and proximate cause were for the jury and not to be resolved as matters of law. The result as to each has adequate record support.
 
 III
 
 23
 The last argument is that the several verdicts are excessive. As to this, we must initially refer to Solomon Dehydrating Co. v. Guyton, 294 F.2d 439 (C.A.8, 1961), certiorari denied 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192, in which it was said
 
 
 24
 "[E]xcessiveness of a verdict is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and which knows the community and its standards; that this is a responsibility which, for better working of the judicial process and for other seemingly obvious reasons, is best placed upon its shoulders; and that we shall continue to consider review, as we have said before, not routinely and in every case, but only in those rare situations where we are pressed to conclude that there is 'plain injustice' or a 'monstrous' or 'shocking' result." Id. at 447-448.[20]
 
 
 25
 The railroad tells us that $35,000 is the highest award ever to be sustained by the Supreme Court of Arkansas arising from a wrongful death action for the death of a child. From this it is said to follow that the $73,574 awarded the Scoville plaintiffs and the $65,852 given the King family are plainly excessive. It also is suggested that we recognize juries are "sometimes prone to return verdicts against railroads despite the law or the facts." Finally, it is said that the record is devoid of evidentiary support for the $12,000 award to Linda Scoville Smith, the surviving sister of Thomas, and the $15,000 award to the surviving brother and sister of Angela. As to these awards, the argument is made that they amount to recoveries for "mental anguish" and, as a consequence, must be excised because it has not been shown that the recipients underwent "more than the normal mental suffering."
 
 
 26
 We are compelled to note preliminarily that this court long ago recognized that care should be taken in a diversity case to see that damage awards do not exceed those which could be sustained were the case before the Supreme Court of the State whose substantive law gives rise to the claim in suit. National Food Stores, Inc. v. Utley, supra, pp. 286-287 of 303 F.2d. Certainly, then, if the Arkansas award of a lesser amount is to supply the high-water mark for all wrongful death cases, this would tend to suggest that the awards here are indeed generous and perhaps excessive. But, while recognizing that the comparison approach is helpful and sometimes forceful, this court has said that each case must be evaluated as an individual one, within the framework of its distinctive facts, with some recognition being given the continuing erosion in the purchasing power of the dollar. Century "21" Shows v. Owens, supra, p. 611 of 400 F.2d. Upon consideration of this latter factor, we note that the Arkansas case on which the railroad so heavily relies, Norman v. Gray, supra, p. 489 of 383 S.W.2d, is one which was tried in 1963. To blithely assume that $35,000 in 1963 translates into an equivalent sum today is, as the plaintiffs suggest to overlook the significance and impact of inflation. With these factors in mind, we turn to the individual awards.
 
 
 27
 A. Mrs. Scoville; Mr. and Mrs. King; and the estate of Thomas and Angela. The reasonableness of all awards was unsuccessfully challenged before the trial court by post-trial motions of the defense. The fact that the trial judge heard the evidence and was thus more familiar than we with the evidentiary atmosphere at trial gives him, we think, a better informed mind on the subject than we have. Nevertheless, we have carefully evaluated the pertinent evidence and although the amount of these awards might be somewhat in excess of what we might have allowed, had we been the trial judge, we do not regard the allowances as "monstrous" or "plainly unjust", and we therefore do not disturb them. We are moved to observe, in response to the suggestion of possible prejudice against the railroad, that aside from a jury's normal compassion for families who have lost loved ones, the railroad has not pointed to a single trial event or evidentiary item which might have induced the jury to act out of passion or prejudice.
 
 
 28
 B. The surviving sister of Thomas and the surviving brother and sister of Angela. It is conceded that these awards constitute recoveries for "mental anguish." That being so, we are necessarily and initially confronted with the Arkansas decision, Peugh v. Oliger, 233 Ark. 281, 345 S.W.2d 610 (1961), overruled on other grounds Fountain v. Chicago R. I. & P. Ry., 243 Ark. 947, 422 S.W.2d 878, 879-880 (1968), in which the Supreme Court of Arkansas said, at p. 617,
 
 
 29
 "[T]he Legislature, in allowing recovery for mental anguish, meant something more than recovery for the normal grief occasioned by the loss of a loved one. To be grieved or to be shocked by the death of a loved one is natural, but in order to recover . . . one must suffer more than the normal grief."
 
 
 30
 The Arkansas court has had no less than four occasions to consider and refine the "more-than-the-normal-grief" language. See St. Louis Southwestern Railway Company v. Farrell, 242 Ark. 757, 416 S.W.2d 334, 339-341 (1967); Pitts v. Greene, 238 Ark. 438, 382 S.W.2d 904, 906-907 (1964); Tiner v. Tiner, 238 Ark. 222, 379 S.W.2d 425, 433-434 (1964); and Mode v. Barnett, 235 Ark. 641, 361 S.W.2d 525, 531 (1962). Perhaps the most helpful explication of the meaning of this standard is to be found in St. Louis Southwestern Railway Company v. Farrell, where, at p. 340 of 416 S.W.2d, the court stresses the necessity of showing exceptional circumstances or a particular relationship between the damage recipient and the deceased to sustain the award.
 
 
 31
 The trial court instructed the jury in accordance with the Peugh standard, and we must assume that the jury properly understood and correctly applied that standard. Certainly the railroad has pointed to nothing in the record to contraindicate this. Although we must concede that the evidence bearing upon these awards could have been more substantial, our review of the record reveals evidence from which the jury could find that the sister of Thomas and the brother and sister of Angela suffered more than transient or passing sorrow on the passing of their loved ones. There is evidence indicating the closeness of relationship and association contemplated in Farrell and, as we have seen, death came in a sudden and violent manner. In these circumstances, we are not persuaded that the awards are "monstrous" or "plainly unjust."
 
 
 32
 The verdicts are not excessive.
 
 
 
 [1]
 There is a sharp conflict in the record testimony as to whether this stop sign was in an upright position at the time of the accident and, if it was, whether it was clearly visible to approaching motorists. The record clearly indicates, however, that the sign was mounted in its normal position some two hours after the accident when the defendant's claim agent went to the scene to take some pictures
 
 
 [2]
 No assertion is made that the railroad was exceeding a designated speed limit in its approach to the crossing
 
 
 [3]
 Ark.Stat.Ann. Sec. 75-637 (1957 Repl.), as amended (1959), requires a motorist who approaches a railroad grade crossing to come to a stop not less than 15 feet from the nearest rail of the tracks. This rule is to apply, inter alia, (1) when a train approaching within approximately 1500 of the crossing emits a signal audible from such distance and the train, by reason of its speed or nearness to the crossing, is an immediate hazard, or (2) when an approaching train is plainly visible and is in hazardous proximity to the crossing. The statute further provides that the motorist is not to proceed further until he can do so safely. The railroad seems to suggest (a) that Thomas violated this statutory rule of the road in stopping his automobile two and one-half feet short of the crossing; (b) that this violation is strong and dispositive evidence of his contributory negligence; and (c) that this negligence proximately caused the accident
 
 
 [4]
 Ark.Stat.Ann. Sec. 73-716 (1957 Repl.), requires the ringing of a bell or the blowing of a whistle at least 80 rods from any crossing and further requires that the ringing of the bell or the blowing of the whistle continue until the engine has passed the crossing. The testimony in this case is contradictory in that the engineer and fireman, and, as well, the only eyewitness to the accident, testified positively that the statutory warnings were given. Certain witnesses for the plaintiffs, on the other hand, all of whom were in close proximity to the track, conscious of its presence, and so situated as to be able to hear, testified that no warning was sounded
 
 
 [5]
 The Honorable Miles W. Lord, United States District Judge, District of Minnesota, presided at the trial pursuant to special designation
 
 
 [6]
 The court properly made rulings with regard to each motion. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 253, 61 S.Ct. 189, 85 L.Ed. 147 (1940)
 
 
 [7]
 St. Louis & S.F. Ry. Co. v. Ferrell, 84 Ark. 270, 105 S.W. 263, 264 (1907). See Missouri Pacific Railroad Company v. Ellison, Ark., 465 S.W.2d 85, 88-89 (1971); Sherman v. Missouri Pacific Railroad Company, 238 Ark. 554, 383 S.W.2d 881, 882-884 (1964); Chicago Rock Island & Pacific Railroad Company v. Sparks, 220 Ark. 412, 248 S.W.2d 371, 372-373 (1952); St. Louis & S.F. Ry. Co. v. Perryman, 213 Ark. 550, 211 S.W.2d 647, 650-652 (1948); and Smith v. Missouri Pacific Railroad Company, 208 Ark. 40, 184 S.W.2d 951, 952 (1945). Cf. Phillips v. Kurn, 145 F.2d 908, 911-912 (CA8 1944). Compare, Prosser, Law of Torts, Sec. 41, at 238 (4th Ed. 1971)
 
 
 [8]
 R., at 50. (Appendix, at 39)
 
 
 [9]
 Under Arkansas decisional law, a motorist may, at least to some extent, assume that an approaching train will sound the warning required by statute. Missouri Pacific Railroad Company v. Howell, 198 Ark. 956, 132 S.W.2d 176, 179-180 (1939); Missouri Pacific Railroad Company v. Lemons, 198 Ark. 1, 127 S.W.2d 120, 122 (1939); Smith v. Missouri Pacific Railroad Company, 138 Ark. 589, 211 S.W. 657, 658 (1919); Kansas City Southern Railway Company v. Drew, 103 Ark. 374, 147 S.W. 50, 53 (1912); and Arkansas & L. Ry. Co. v. Graves, 96 Ark. 638, 132 S.W. 992, 994 (1910)
 
 
 [10]
 "The very essence of [the jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable." Tennant v. Peoria & Pekin Union Railway Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944). So it is in Arkansas. See, for example, Page v. Boyd-Bilt, Inc., 246 Ark. 352, 438 S.W.2d 307, 309 (1969); Home Mutual Fire Insurance Company v. Cartmell, 245 Ark. 45, 430 S.W.2d 849, 851-852 (1968); and Missouri Pac. R. Co. et al. v. Yelldell, 199 Ark. 343, 133 S.W.2d 642, 643 (1939). See generally, Comment, Arkansas Standards for Testing the Sufficiency of Evidence, 25 Arkansas Law Review 288 (1971)
 
 
 [11]
 The jury was instructed that proof of violation of the warning statute proves negligence. R., at 186. This instruction squares with pertinent Arkansas decisional law. Missouri Pacific Railroad Company v. Yelldell, 199 Ark. 343, 133 S.W.2d, at 643
 
 
 [12]
 St. Louis Southwestern Railway Company v. Farrell, 242 Ark. 757, 416 S.W.2d 334, 338 (1967); St. Louis Southwestern Railway Company v. Jackson, 242 Ark. 858, 416 S.W.2d 273, 278 (1967); and Hawkins v. Missouri Pac. R. Co., 217 Ark. 42, 228 S.W.2d 642, 644 (1950)
 
 
 [13]
 On the question of the extrahazardous crossing, the trial judge, quoting verbtaim from Arkansas Model Instruction 1805, gave the following instruction:
 "Plaintiffs contend that the railroad grade crossing in this case was abnormally dangerous, and they have the burden of proving this proposition.
 "If a railroad grade crossing is frequently used by the traveling public, if trains pass over it frequently, and if the crossing is so dangerous because of surrounding circumstances that a reasonably careful person could not use it in the absence of special warnings, then it would be an abnormally dangerous crossing. Whether the railroad grade crossing in this case was abnormally dangerous is for you to decide.
 "If you find that the crossing was abnormally dangerous, as I have defined that term, then it was the duty of the railroad to use ordinary care to give a warning reasonably sufficient to permit the traveling public to use the crossing with reasonable safety."
 
 
 [14]
 Records introduced through a representative of the Arkansas State Highway Department reflect that the volume of traffic for November 25, 1968 was 1356 automobiles and 17 trains
 
 
 [15]
 A significant facet of this argument is that Thomas approached the crossing charged, under Sec. 75-637, n. 3 supra, with the duty of bringing his automobile to a stop within 50 feet and not less than 15 feet of the nearest rail. We already have observed that this statutory duty does not become applicable unless the railroad emits an audible signal from a distance of not less than 1500 feet of the crossing, or unless the train is plainly visible. In view of the controversy on the signal issue, and because a violation of the statute can amount only to some evidence of negligence, see, for example, Bussell v. Missouri Pacific Railroad Company, 237 Ark. 812, 376 S.W.2d 545, 548 (1964), we are unable to view the statute as one having dispositive significance
 
 
 [16]
 Ben M. Hogan & Company v. Krug, 234 Ark. 280, 351 S.W.2d 451, 453-456 (1961) and Collier v. Citizens Coach Company, 231 Ark. 489, 330 S.W.2d 74, 76 (1959)
 
 
 [17]
 Blythe v. Byrd, Ark., 472 S.W.2d 717, 719-720 (1971); Norman v. Gray, 238 Ark. 617, 383 S.W.2d 489, 490 (1964); Dixie Furniture Co. v. Deason, 226 Ark. 742, 293 S.W.2d 706, 708 (1956); Booth & Flynn v. Price, 183 Ark. 975, 39 S.W.2d 717, 720 (1931); and Coca Cola Bottling Co. v. Shipp, 174 Ark. 130, 297 S.W. 856, 860 (1927)
 
 
 [18]
 It is to be noted that the contributory negligence of Thomas, if such were determined to exist, is not imputable to Angela. See Hass v. Kessell, 245 Ark. 361, 432 S.W.2d 842, 844-845 (1968) and Chicago, R. I. & P. R. Co. v. Davis, 239 Ark. 1059, 397 S.W.2d 360, 362 (1965). Her recovery is barred only if it is determined that the negligence of Thomas was the sole proximate cause of the accident
 
 
 [19]
 Baker v. Matthews, 241 Ark. 539, 408 S.W.2d 889, 890 (1966)
 
 
 [20]
 See also, O'Brien v. Stover, 443 F.2d 1013, 1019 (CA 8 1971); St. Paul Fire & Marine Insurance Company v. Arkla Chemical Corporation, 435 F.2d 857, 859 (CA 8 1971); Austin v. Euclid-Memphis Sales, Division of Trippeer Organizations, Inc., 434 F.2d 285, 288-289 (CA 8 1970); Clark v. Central State Dredging Co., 430 F.2d 63, 67 (CA 8 1970); Century "21" Shows v. Owens, 400 F.2d 603, 611-612 (CA 8 1968); Smith v. American Guild of Variety Artists, 349 F.2d 975, 984 (CA 8 1965); Lowery v. Clouse, 348 F.2d 252, 255-256 (CA 8 1965); Chicago, Rock Island and Pacific Railroad Co. v. Melcher, 333 F.2d 996, 1001-1002 (CA 8 1964); Bankers Life & Casualty Company v. Kirtley, 307 F.2d 418, 423-425 (CA 8 1962); National Food Stores, Inc. v. Utley, 303 F.2d 284, 286-287 (CA 8 1962); and Honebein v. McDonald, 299 F.2d 493, 496 (CA 8 1962). Cf. Zatina v. Greyhound Lines, Inc., 442 F.2d 238, 242 (CA 8 1971); Perry v. Bertsch, 441 F.2d 939, 944-945 (CA 8 1971); Evans v. United States, 326 F.2d 827, 829 (CA 8 1964); and Riss v. Anderson, 304 F.2d 188, 198 (CA 8 1962). Willis v. Elledge, 242 Ark. 305, 413 S.W.2d 636, 639-640 (Ark.1967) and Holmes v. Hollingsworth, 234 Ark. 347, 352 S.W.2d 96, 98 (Ark.1961)