**Winfred LOWE, Administrator of the Estate of Thelma Lowe, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Leonard MADISON, Administrator of the Estate of Lula Mae Madison, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Gertie B. MITCHELL, Administratrix in SUCCESSION OF the Estate of Eliza WALKER, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Willie H. MOODY, Administrator of the Estate of Geraldine Moody, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Willie D. KELLY, Administrator of the Estate of Shirley J. Kelly, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Insurance Company of North America, Intervenor.

Nos. 77–1008, 77–1031 to 77–1034.

United States District Court,
W.D. Arkansas,
El Dorado Division.

March 16, 1987.

Phillip H. McMath and James B. McMath, The McMath Law Firm, Little Rock, Ark., for Lowe.

Larry R. McCord, Asst. U.S. Atty., Fort Smith, Ark., and Sophie Smyth and Ralph H. Johnson, Torts Branch, Dept. of Justice, Washington, D.C., for U.S.

## MEMORANDUM OPINION

OREN HARRIS, District Judge.

This consolidated matter came to be heard before the Court commencing February 2, 1987, on the issue of damages.[1] The procedural and appellate history are well documented throughout the eleven years since the accident which occurred March 8, 1976, from which these actions arise. Therefore, the Court shall not undertake to restate that history.

The damages phase of this bifurcated matter was tried to the Court, without the intercession of a jury. It was tried to a completion in three days. Thereupon, the matter was taken under advisement with the parties given the opportunity to file post trial briefs. The briefs having been received, the matter is ready for a decision. The Court incorporates herein findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

---

1. The Court entered a Memorandum Opinion and Judgment on August 1, 1986, ruling in favor of the plaintiffs and against the United States on the issue of liability in these consolidated Federal Tort Claims actions. In that ruling the Court dismissed plaintiffs' causes of action against Highland Resources, Inc., the lessor of the building utilized by Celesco at the East Camden facility for the production of photoflash cartridges under contract with the United States.

At the outset of the trial on damages, it was announced that certain the plaintiffs represented by the McMath law firm had reached a Stipulation with the government as to amount of damages sustained by those plaintiffs. These plaintiffs are Carl McMichael, administrator of the estate of Emma McMichael, deceased, Mrs. Lamar Bartlett, Edna Rogers, Flora Weaver, Georgia Ray and Billy Harrison, administrator of the estate of Elsie Marie Harrison, deceased, case numbers 77–1006, 77–1008, 78–1006, excluding the claim of Winfred Lowe, administrator of the estate of Thelma Lowe, deceased. The sum of the Stipulation and the terms thereof are set out specifically in Joint Exhibit 1, introduced at trial.[2] Therefore, the Court concludes that a Judgment should be entered for each of these named plaintiffs and against the United States in the amounts as reflected by the Stipulation.

In regard to the McMath plaintiffs, there was an issue raised by an earlier Motion for Summary Judgment, and later raised in plaintiffs pretrial submission, regarding the timeliness of the filing of the intervention complaint by Insurance Company of North America. Although the Court has heretofore denied plaintiff's Motion for Summary Judgment, plaintiffs revived the issue. Upon conclusion of the hearing in this matter, the Court announced that it would withhold a ruling on the intervention issue pending a ruling in the damages phase of this ongoing litigation.

Subsequent to the hearing, the McMath plaintiffs, the Whetstone plaintiffs and Insurance Company of North America reached an agreement as to the amount of the subrogation claims, as evidenced by the Stipulation filed February 18, 1987. In that Stipulation, the respective rights of all parties are laid to rest; at least the parties have agreed to "go in peace". The Court incorporates the terms and conditions of that Stipulation as if recited word for word herein.

Turning to the individual claims, the Court will address each of the five remaining cases separately. The first of such cases, *Lowe, Administrator of the Estate of Thelma Lowe, deceased,* involves injuries suffered in the explosion only. The remaining four cases, *Kelly, Madison, Moody* and *Mitchell* are wrongful death cases. In each case the plaintiffs seek to recover substantial damages from the government. The elements of damage that the parties seek to recover include compensatory damages, pecuniary injuries, mental anguish, conscious pain and suffering, loss of services and loss of consortium.

### LOWE ESTATE

In the matter of *Winfred Lowe, administrator of the estate of Thelma Lowe, deceased,* it should be first noted that, during the pendency of this action, Mrs. Lowe died subsequent to the accident from a nonrelated illness, "multiple myeloma", a form of bone cancer. The action was initially brought by Mrs. Lowe. Upon her death her estate, by and through Winfred Lowe, administrator, was substituted as the proper party plaintiff under Arkansas law. *See* Ark.Stat.Ann. 27–901.

At the time of the accident, Mrs. Lowe was 49 years old.[3] She had returned from lunch to her assigned work station in Building M–35 when the explosion occurred.

2. The Stipulation recites that the damages suffered by these plaintiffs are as follows:

| | |
|---|---|
| Carl McMichael, administrator | $100,000.00 |
| Mrs. Lamar Bartlett | $175,000.00 |
| Edna Rogers | $ 92,657.08 |
| Flora Weaver | $ 75,000.00 |
| Georgia Ray | $100,000.00 |
| Billy Harrison, administrator | $100,000.00 |

These amounts include attorneys fees and all costs.

Entry into the Stipulation does not operate as a waiver of the government's right to appeal the Court's ruling on the liability issue. *See,* Memorandum Opinion and Judgment entered August 1, 1986. Further, plaintiffs assumed all obligations on subrogation by the intervenor.

3. Although certain documents received into evidence at trial on the issue of damages, including the original tort claim, reflect an age of 54 years at the time of the explosion, the Admission Sheet of the medical records of Ouachita Hospital, introduced as Plaintiff's Exhibit 10, state a birthdate of August 22, 1926.

She was knocked unconscious by the blast. She was transferred to Ouachita Hospital in Camden, Arkansas by ambulance, where she was admitted at 1:30 p.m. The injuries sustained were diagnosed as a fracture of the left humerus, a fracture of the left ankle, multiple fractures to the left ribs, multiple lacerations and abrasions to the left forearm and injuries to both ear drums.

In his deposition, Dr. James Guthrie of Camden, the treating physician, stated that Mrs. Lowe was conscious when she arrived at the hospital. He outlined the course of repair and treatment of the injuries sustained. Mrs. Lowe was fitted with a "long leg" walking cast and a "Caldwell" cast on the left arm. She was discharged from Ouachita Hospital on March 24, 1986, with a potential to recover well. However, Mrs. Lowe began to suffer lower back pain some after discharge.

On July 26, 1976, Mrs. Lowe was examined by Dr. Earnest Hartmann, an orthopedic surgeon in El Dorado. His examination revealed a compression fracture of the lumbar spine. She was fitted with a lumbosacral support at that time.

Mrs. Lowe was later diagnosed as having post-menopausal osteoporosis, with such condition having pre-dated the injury. It was the opinion of Dr. Guthrie and Dr. Austin Grimes, an orthopedic surgeon, that the injuries resulting from the explosion aggravated this preexisting condition. The severity of the osteoporosis was enhanced by Mrs. Lowe's decreased physical activity following the accident. Although Dr. Guthrie testified that Mrs. Lowe did not recover as well as he had expected, he stated that she should have been able to return to work on January 1, 1977.

The myeloma was suspected in June 1979, with such diagnosis being confined in July 1979. Dr. Grimes testified by deposition that the myeloma was probably not advanced to such a level as to have had an impact upon the initial injuries. It is not contended that the injuries suffered in the blast were a proximate cause of Mrs. Lowe's death.

■ The estate established that Mrs. Lowe would have worked 299 days in 1976 but for the injuries. She was earning $2.94 per hour at the time, working a forty hour week. Based upon mathematic computation, her lost earnings total $5,009.00. The government concedes that such amount is a proper measure of lost earnings. The estate established that she incurred medical expenses totaling $4,514.57 as a result of the injuries. The government concedes that this measure of medical expenses is correct and a proper measure of damages. Therefore, the estate is entitled to Judgment in the amount of $9,523.57 for these damages.

Additionally, the Court finds that an award of money damages for pain and suffering is appropriate under the facts of this case. Mrs. Lowe suffered severe, debilitating injuries. Her usual activities became impossibilities. The analysis of this element of damage is complicated somewhat by the onset of the myeloma. At a certain point the pain and suffering associated with the myeloma overcame Mrs. Lowe. Of course, no pain and suffering resulting from the myeloma is compensable in this action.

■ From a review of all the evidence pertaining to Mrs. Lowe, her injuries, her activities before and after the accident and the evidence pertaining to her medical history subsequent to the explosion, the Court finds that a fair and reasonable compensation for the conscious pain and suffering of Mrs. Lowe is $50,000. A separate Judgment shall be entered in favor of her estate in the amount of $59,523.57 contemporaneously herewith.

The term "pecuniary injuries" in a wrongful death action refers to the present value of benefits, including money, goods and services which the deceased would have contributed to the claimed beneficiaries had she lived. *Martin v. United States*, 448 F.Supp. 855 (1977), affirmed in part and remanded in part, 586 F.2d 1206 (1978). Various factors are to be considered in reaching a determination of pecuniary injuries, including:

(1) What she customarily contributed in the past and what she might reasonably have been expected to contribute had she lived;

(2) The period during which any beneficiary might reasonably expect to have received contributions from the deceased;

(3) What the deceased earned and what she might reasonably have been expected to earn in the future;

(4) What she spent for customary personal expenses and other deductions;

(5) What instruction, moral training, and supervision of education she might reasonably have given the children had she lived;

(6) Her health;

(7) Her habits of industry, sobriety, and thrift;

(8) Her occupation;

(9) The life expectancy of the deceased and of the spouse; and

(10) The time which will elapse before each child reaches majority.

See: Id. at 876.

█ The Arkansas Supreme Court has distilled some thirteen factors which are utilized in evaluating awards for mental anguish in wrongful death cases. The factors are:

(1) The duration and intimacy of their relationship and the ties of affection between the decedent and the survivor;

(2) Frequency of association and communication between an adult survivor and an adult decedent;

(3) The attitude of the decedent toward the survivor and of the survivor toward the decedent;

(4) The duration and intensity of the sorrow;

(5) Maturity or immaturity of the survivor;

(6) The violence or suddenness of the death;

(7) Sleeplessness or troubled sleep over an extended period;

(8) Obvious extreme or unusual nervous reaction to the death;

(9) Crying spells over an extended period of time;

(10) Adverse effect on survivor's work or school;

(11) Change of personality of the survivor;

(12) Loss of weight by survivor or other physical symptoms; and

(13) Age and life expectancy of the decedent.

See: Martin v. Rieger, 289 Ark. 292, 711 S.W.2d 776 (1986); cited in Kelley v. Wiggins, Administrator, 291 Ark. 280, 724 S.W.2d 443 (1987). Of course, such mental anguish must be real and with cause and be more than the normal grief occasioned by the loss of a loved one. See: Peugh v. Oliger, 233 Ark. 281, 345 S.W.2d 610 (1961), cited in Connell v. Steel Haulers, Inc. 455 F.2d 688, 691, n. 2 (1972). The Court notes from the outset of its consideration of the death cases that a primary factor existing in each case is the suddenness and violent nature of the deaths. However, this factor is not sufficient, standing alone, to support an award of damages for mental anguish.

Applying the factors listed above, the Court proceeds to a decision on the damages sustained by each estate resulting from the explosion at Celesco.

## MADISON ESTATE

The estate of Lula Mae Madison, by and through the administrator Leonard Madison, seeks to recover damages under the Arkansas Wrongful Death statutes, Ark. Stat.Ann. 27–906, 908, 909.[4] The elements of damages sought include funeral expenses, lost earnings, lost household services, mental anguish and other damages for the surviving spouse, Leonard Madison, and mental anguish for James C. Stancile, an adult brother of the decedent. Each of these elements of damage are compensable

---

**4.** Mr. Madison did not appear at trial as a witness due to the onset of severe illness which required immediate surgery. In the course of the trial, counsel for the estate offered a statement from Mr. Madison's attending physician concerning the gravity of the illness and grim prognosis. The Court would note that the failure to testify does not bar an award of damages to Mr. Madison for mental anguish arising out of the death of his wife.

under the Arkansas wrongful death statutes cited above. *See also:* AMI 2215.

▮▮▮ The evidence reveals that Mrs. Madison died instantly in the explosion. Therefore, no award of damages for pain and suffering is made. The estate incurred a funeral expense of $1,505.00. Recovery should be had for that sum. The government concedes that the damage for Mrs. Madison's lost earning capacity is $71,843.00 based upon the expert testimony of Dr. Charles Bettinger presented by plaintiffs. Mrs. Madison was 43 years old at her death. She had a work life expectancy of 9.7 years. She was earning $2.92 per hour.

Evidence was presented pertaining to the loss of household services. Mrs. Madison's life expectancy was 31.3 years at her death. The estate presented testimony that Mrs. Madison performed 43 hours per week of household services, based upon a chart prepared by Mr. Ronald Murphy. The government challenges the validity of the hours, especially as the chart pertains to five hours per week of watering house plants and two hours per week of "decorating", without explanation.

The Court is of the opinion that there is some basis for such an objection to these specific hours. Further, the Court is of the opinion that the remarriage of Mr. Madison tends to negate an award for lost services for those married years. An award of damages for lost future services, post-February 1, 1987, for those married years would amount to a windfall to Mr. Madison.

▮▮▮ Therefore, the Court is of the opinion that the Madison estate is entitled to recover past services lost (from March 8, 1976 through February 1, 1987). Although it is undisputed that Mr. Madison has remarried, there is no proof of the date of such event. Had the government presented some proof of this date, the Court could have reasonably calculated the damage for past services lost on a basis other than adopted here. However, based upon the record, it would be speculative for the Court to make a determination of when Mr. Madison did, in fact, remarry. No award is made for lost future services, post-February 1, 1987.

▮▮▮ Having reviewed the testimony received pertaining to past service lost, the Court finds that the estimation of Mr. Murphy upon which Dr. Bettinger relies is inflated. Considering the nature of the hours claimed, the Court is compelled to reduce certain hours. Pertaining to the claimed five hours per week for indoor plant care and the two hours per week attending to decorating duties, the Court is not persuaded that the total of these hours is reasonable. The Court is not bound to accept uncontroverted evidence which reason and judgment do not support. The Court finds that there should be a reduction of ten per cent of the total of 43 hours. Thus, the total hours compensable for past lost services equals 38.7 hours. Based upon Dr. Bettinger's calculations of such past lost services, with the reduction of the ten per cent, the Court concludes that the estate is entitled to recover $62,849.70 for past lost services.

▮▮▮ The brother of Mrs. Madison, James C. Stancile, testified that the police notified him of the explosion. Mr. Stancile resided in Magnolia, Arkansas. He proceeded to Ouachita Hospital in Camden where he first saw Mr. Madison the night of the explosion, March 8, 1976. Mr. Stancile related the extremely distraught condition in which he found Mr. Madison that night. The testimony was that Mr. Madison was "never too much right" thereafter. Mr. Stancile testified that Mr. Madison moved from Camden two or three years later to California. Mr. Stancile related that the only reason given by Mr. Madison for the move was that he no longer had a home in Camden without his wife. Notwithstanding his remarriage, the Court finds that Mr. Madison suffered more than the normal grief associated with the loss of his wife. Thus, an award for mental anguish is warranted for Mr. Madison. The Court concludes that an award of $100,000 for mental anguish and loss of consortium to Mr. Madison is appropriate and reasonable herein.

As for his own reaction to the death of his sister, Mr. Stancile testified that he and Mrs. Madison were the only members of their family surviving at the time. Thus, the loss of her left him without family for support and comfort. He testified that the loss of his only family member continues to disturb him. However, Mr. Stancile was married at the time. It is not as though he were left totally without family. Mr. Stancile testified that he communicated or visited his sister one or two times monthly. Mr. Stancile stated that he and his sister were "real close".

■ As noted above, the Arkansas Supreme Court has outlined certain factors to be utilized in evaluating mental anguish claims. The evidence herein support a finding that Mr. Stancile did suffer more than normal grief with the loss of his sister. For such mental anguish the Court finds that an award of $5,000.00 is appropriate.

Therefore, the Court concludes that Judgment should be entered for the Madison estate in the sum of $241,197.70.

## KELLY ESTATE

In the Kelly case, Willie D. Kelly, the surviving spouse and administrator of the estate of Shirley Kelly, seeks to recover for pecuniary injuries, conscious pain and suffering, mental anguish and "other damages" resulting from her death. Also, claims for mental anguish are made by her four children, her mother, Ruby Jones, a sister, Dorothy Jones, and a brother, Terry Jones. Mrs. Kelly was admitted to Ouachita Hospital in critical condition with third degree burns over 95% of her body. She remained alive in such condition for some 32 hours.

■ The evidence adduced at trial proves that the funeral expenses totaled $1,505.00. Mrs. Kelly's medical expenses totaled $1,296.00. The government concedes that these sums are correct and appropriate for payment. In regard to lost earning capacity, expert testimony was presented that the total of such damage is $243,726.00. The government concedes that this figure is correct according to regular methods of calculation. She was 29 years old at her death and had an expected work life of 21.5 years. She was earning $2.94 per hour at her death, working 40 hours per week.

■ As regarding loss of household services, Ronald Murphy testified that Mrs. Kelly would have performed an average of 37.5 hours per week of household services up to the time the youngest of the four children reached age 18. Thereafter, she would have performed an average of 29.5 hours per week of such services. Based upon this data, Dr. Bettinger, plaintiffs' expert witness, calculated that the loss of household services totals $193,827.00. The government concedes that this total is a reasonable amount. Therefore, such sum should be awarded to the estate.

■ As noted above, Mrs. Kelly survived the explosion and resulting injuries for some 32 hours. During this time she was in and out of consciousness. Also, she was under the influence of various pain medications. Although there is no evidence concerning the precise hours of consciousness/unconsciousness, the Court is of the opinion that a reasonable sum should be awarded for conscious pain and suffering. The testimony supports a finding that she did in fact experience pain and discomfort in her parting hours in the hospital. The nature and severity of the injuries alone support a conclusion that she was not without pain and suffering. Her facial features were burned almost beyond any recognition. Mr. Kelly testified that the nurses administered regular injections of pain medication to ease Shirley's pain. He related outbursts of screams and moans. Under these circumstances the Court concludes that the estate should be awarded $50,000.00 for conscious pain and suffering.

Mr. Kelly claims damages for mental anguish and loss of services and companionship. Mr. Kelly has not remarried since the loss of his wife of almost nine years. They shared a loving husband-wife relationship. He was home at the time of the explosion. He testified that he felt the earth tremble. Soon thereafter, his moth-

er-in-law, Ruby Jones, informed him of the explosion at M–35 and that Shirley had been injured. At that time he was not aware of the severity of the injuries.

He proceeded to the hospital where he was allowed to enter the room in which Shirley was being treated. He testified that she was burned beyond recognition. He testified that she had no hair and that her nose and one ear had been burned off. Her body was covered with glass, cement and brick debris. He stated that he could only remain in her room for twenty minutes. He remained at the hospital throughout her struggle with death.

Following her death, Mr. Kelly suffered severe emptiness resulting from the loss of his wife. This emptiness acutely manifested itself on the special occasions such as Christmas and Mother's Day. His testimony recounted many sleepless nights. On those nights in which sleep did come, his dreams became nightmares. Also, Mr. Kelly testified that he lost some thirty pounds as result of the loss of his wife.

■ With regard to the claim for mental anguish and loss of marital companionship, services and society by Willie Kelly, the surviving spouse, the Court finds that, in consideration of the factors outlined by the Arkansas Supreme Court, an award of damages in the sum of $100,000.00 is appropriate under the facts of this case.

At the time of the explosion, Mrs. Kelly was survived by four daughters, Sharon Kelly, age seven, Janice Kelly, age five, Diane Kelly, age three, and Sandra Kelly, age 11 months. Sharon Kelly testified that her father picked her up from school the day of the explosion and informed her that her mother was seriously injured. Her father left her with her grandmother, Ruby Jones, where she remained while he returned to the hospital. Although she recalled the incident and the funeral, she had little or no understanding of the nature of her mother's condition. She recalled crying at the funeral but stated that she was not effected seriously by the loss of her mother, other than "missing her." Considering her age and experiences in life at that point, she could not have been expected to

react in the same way as a more mature individual would have reacted. Each of the other daughters testified as having no recollection of their mother or the explosion.

■ Based upon the facts herein, the Court is of the opinion that the daughters did not experience mental anguish for which recovery is warranted. However, each of the daughters have and will continue to suffer the loss of parental guidance which their mother would have provided. Based upon the facts of the case, the Court finds that Sharon Kelly should recover the amount of $75,000.00, Janice Kelly should recover $80,000.00, Diane Kelly should recover $90,000.00, and Sandra Kelly, who will be deprived of her mother's guidance for virtually her entire life, should recover $100,000.00 for her loss.

Shirley Kelly's mother, Ruby Jones, lived next door to her daughter in the same housing project. Mrs. Jones served her daughter as babysitter while Shirley worked at Celesco. Mrs. Jones and her daughter enjoyed closer than the normal mother/daughter relationship. The close proximity of their respective abodes allowed frequent visits and outings together, in addition to Mrs. Jones' babysitting.

Mrs. Jones was at the hospital soon after Shirley was admitted. She did not initially enter Shirley's room due her own health. However, she later went into the room. She did not remain there for a substantial period. Mrs. Jones was unable to endure the suffering of her daughter. Mrs. Jones testified that she "just went out" when Shirley died. She related her subsequent medical treatment which was required, including hospitalization. She stated that she lost eighteen pounds thereafter.

■ Based upon these facts the Court concludes that Ruby Jones has suffered more than the normal grief in the loss of her daughter. Thus, she is entitled to recover for her mental anguish. Upon careful consideration, the Court concludes that an award of $50,000.00 is warranted for such mental anguish.

Since Shirley's death, Mrs. Jones and Shirley's sister, Dorothy Jones, have taken

the responsibility for caring for the day-to-day needs of Shirley's four children. Mrs. Jones and Dorothy have sacrificed the past eleven years of their lives for the proper care and training of the children. This is not to imply that Willie Kelly has been less than a father. Willie Kelly provides monetary support for and takes an active part in the lives of his children. However, Ruby Jones and Dorothy Jones have assumed the primary roles of parenthood. Dorothy has never married.

Dorothy was also an employee of Celesco at the time of the explosion. However, she chose not to report to work that fatal day because of the weather conditions. The testimony revealed that because of fiscal needs of the family Shirley was compelled to work. After the explosion and the loss of her sister, Dorothy terminated her employment with Celesco. Her decision was based upon a combination of the memories of her sister, Shirley's painful death and the horror of the facility with its life threatening potential.

■ Based upon the foregoing the Court finds that Dorothy Jones suffered more than the normal grief associated with the loss of a loved one. Therefore, an award of damages to her for mental anguish is appropriate. The Court concludes that an award of $25,000.00 to Dorothy Jones is warranted.

Shirley Jones was also survived by a brother, Terry Jones. Mr. Jones also lived near Shirley and Willie in the housing project. Mr. Jones was a frequent visitor in the Kelly home and he was in contact with Shirley at least one time per day. Mr. Jones was allowed to see Shirley in the hospital before her death. The sight of her injuries unsettled Mr. Jones. He was unable to return to the hospital thereafter.

Mr. Jones testified that he attempted to be strong for the sake of his mother.

■ Mr. Jones had also been an employee of Celesco prior to the explosion. Like Dorothy Jones, he quit his job at Celesco after the explosion. Thereafter, he enrolled in the Oil Belt Vocational-Technical School in El Dorado. Although portions of his testimony on cross examination could be construed as an admission that he suffered no more than normal grief, the Court is convinced that Mr. Jones suffered that degree of mental and emotional suffering which entitles him to recover for mental anguish under the wrongful death statutes. Therefore, the Court concludes that Terry Jones is entitled to recover the sum of $5,000.00 for his mental anguish.

Therefore, Judgment should be entered for the Estate of Shirley Kelly in the amount of $1,125,427.80.

### WALKER ESTATE

Gertie Mitchell, daughter of Eliza Walker and Administratrix in Succession to the Estate of Eliza Walker, deceased,[5] seeks to recover damages from the United States for funeral expenses, lost earnings, mental anguish and lost services.

Mrs. Mitchell was a Registered Nurse employed at Ouachita Hospital at the time of the explosion. However, she was off duty at the time of the explosion. Upon learning of the accident and of her mother's involvement therein, she proceeded to the hospital. Mrs. Mitchell was met by her supervisor who carried her to the room to which her mother's body had been removed. Mrs. Mitchell testified that, except for her mother's unique gold tooth, she would not have been able to identify the body as being that of her mother. Much like the other victims of this explosion, Mrs. Walker had sustained third degree burns to 95% of her body.[6]

---

5. Oscar Mitchell, the surviving spouse of Eliza Walker, commenced this action as Administrator of the Estate of Eliza Walker. Mr. Walker died while this action was pending, therefore, all claims insofar as pertaining to Mr. Walker have abated. Also surviving was Mrs. Walker's sister Eva Mae Stroud. Mrs. Stroud died November 24, 1983. Therefore, any claim on her behalf has likewise abated.

6. At trial Mrs. Mitchell attempted to establish that her mother had survived the explosion for some two to two and one-half hours. She based her opinion upon the fact that an X–Ray was taken of her mother's skull upon arrival at the hospital. Plaintiff's Exhibit 6 reflects that Mrs. Walker entered Ouachita Hospital at 2:00 p.m. This exhibit reflects that she was pronounced dead at 2:25 p.m. The second page of Exhibit 6,

The estate incurred a funeral expense of $911.25. There was no medical expense. The estate, by and through Mrs. Mitchell, is entitled to recover that sum.

█ At the time of her death, Mrs. Walker was 57 years of age. Her life expectancy was 19 years. Her work life expectancy was 5.3 years. Dr. Bettinger testified that her lost earning capacity totaled $38,446.00. The government concedes that this sum is reasonable and accurate.

Mrs. Mitchell seeks to recover for lost services, in the form of babysitting services [7] which her mother would have provided had she survived. Mr. Murphy calculated that Mrs. Walker would have provided some 33 hours per week in babysitting services through the year 1980. Thereafter, the number of hours would have been reduced to 21 hours per week for the next five years up to the time Mrs. Mitchell's youngest child reached the age of 18.

█ The government challenges not the propriety of this type of recovery but, rather, the number of hours claimed. In support of its challenge, the government cites the physical condition of Oscar Walker, who was totally disabled and completely dependent upon his wife. Mr. Walker would have required extra care and comfort in his condition. The additional requirement would have cut significantly into the time claimed for babysitting.

█ Also, the government contends that, as the children progressed in age, the older children would have assumed more of the duties previously assigned to Mrs. Walker. Finally, the government asserts that the youngest child would not have required a babysitter up to his eighteenth birthday. The Court concludes that the government's challenge on these two bases is well taken and justified under the circumstances.

The Court has reviewed the suggested hours and the objections of the government. From that review, the Court finds that while an award for such lost services is appropriate, a reduction of the hours is warranted. Mrs. Walker had a substantial obligation to her disabled husband in addition to her normal homemaking duties. She worked a full 40 hour week at Celesco, plus time for travel to and from the workplace. Undoubtedly she reserved a small amount of time for her own personal needs, the least of which would be the basic necessities of life. To mount atop of these daily duties the added burden of these claimed

---

an X–Ray examination report, is clearly marked "D.O.A."

The lapse of time between admission and pronouncement is reconciled by consideration of all the surrounding circumstances. There was utter chaos resulting from the explosion. The normally quiet emergency ward at Ouachita Hospital became filled with many burned, lacerated, and broken bodies. The ambulances screamed to and from Celesco in attempt to save the lives of those imperiled by the horrendous disaster. The urgency of each person's condition required that the doctors and medical staff on duty make instant decisions for the course of emergency care.

In making these decisions, the medical personnel would have been required to assess the condition of the patient initially. In the case of Mrs. Walker, more likely than not it was instantly determined that she was deceased. Upon making such decision the medical staff simply moved to the next victim. Such action was mandated by the circumstances. If other lives were to be saved, time was of the most essence. There was no time for delay. This best explains the time lag between arrival and pronouncement.

Even if she had been alive from a strict medical point of view, the Court finds that there is no evidence that she was conscious at any time from the explosion until her death. The plaintiff must show that there was conscious pain and suffering in order to recover under this element of damages. This burden has not been met. The Court will not infer pain and suffering under the circumstances herein. The evidence and record as a whole strongly supports a finding that Mrs. Mitchell died instantaneously in the explosion. Therefore, no award for conscious pain and suffering is made.

7. The 1976–1980 services claimed are broken down into 24 hours per week for babysitting, 1.5 hour for chauffering, and the remaining 7.5 hours were devoted to cooking, cleaning, dishwashing and washing. The post–1980 services are broken down as 12 hours babysitting, 1.5 hours chauffering, three hours cooking, two hours cleaning, 1.5 hours dishwashing, and one hour washing. The chauffering, cooking, cleaning, dishwashing, and washing figures remained constant in Mr. Murphy's chart.

babysitting hours would not be a reasonable finding.

■ Under the circumstances of the case, the Court concludes that a reduction by 50% of the hours, both 1976–1980 and post–1980, is reasonable and necessary. The amount claimed for lost services presented by Dr. Bettinger's testimony is $61,570.00. Reducing that amount by 50%, Mrs. Mitchell, on behalf of the estate, is entitled to recover $30,785.00 for all services lost.

■ The Court has considered Mrs. Mitchell's claim for mental anguish and concludes that she did suffer more than normal grief with the passing of her mother. She and her mother enjoyed an extremely close mother-daughter relationship. Mrs. Walker was in the Mitchell home often, not only for babysitting, but also for personal purposes. While Mrs. Mitchell and her husband were stationed out of Camden during the course of Mr. Mitchell's military service, Mrs. Walker would take time off from work to go visit her daughter for a week or so at a time. Mrs. Mitchell would return to Camden during periods of time when her husband would be off base on military assignment. They shared many experiences of life together. For her mental anguish, Mrs. Mitchell is entitled to judgment in the sum of $60,000.00.

Concerning the claim of John Nolan, the brother of Mrs. Walker, the Court finds that an award for mental anguish is likewise merited. Mr. Nolan suffered more than the normal grief with the loss of his sister. They engaged in personal visits at least one time each month throughout their adult lives. Although he did not see Mrs. Walker following the accident, he testified that it was his understanding that her remains were collected in a basket at Celesco after the explosion.

■ Mr. Nolan testified that he suffered through numerous sleepless nights following the death of his sister. He also stated that he required some medical treatment for cardiovascular difficulties subsequent thereto. He related that his mother had also perished in a fire prior to the Celesco incident. This may or may not have heightened his grief. For his mental anguish, the Court finds that an award of $5,000.00 is reasonable and fair.

Therefore, Judgment shall be entered contemporaneously herewith for Mrs. Gertie Mitchell as Administratrix in Succession of the Estate of Eliza Walker, deceased, in the sum of $135,242.25.

## MOODY ESTATE

Willie Moody, as Administrator of the Estate of Geraldine Moody, deceased, seeks to recover damages for funeral expenses, medical expenses, conscious pain and suffering by the decedent, lost earning capacity, lost household services, and mental anguish on behalf of himself and other statutory beneficiaries.[8]

■ Mrs. Moody received third degree burns over approximately 75% of her body in the explosion. The Ouachita Hospital admission report reflects a severe laceration about her face. She was admitted in critical condition. The hospital staff gave her around-the-clock attention. After approximately three days of treatment in the Camden facility, Mrs. Moody was transferred to the University Hospital in Little Rock in critical condition. She survived four additional days before her expiration in the Little Rock hospital. Regular dosages of pain medication were administered to comfort Mrs. Moody. Although she was unconscious for some periods of time, the Court is of the opinion that she endured excruciating conscious pain and suffering prior to her death. For such pain and suffering, the Court finds that an award of $50,000.00 is appropriate.

■ The government concedes that Mrs. Moody's total lost earnings amount to

**8.** Those claiming damages for mental anguish under the Arkansas Wrongful Death statute are Bessie Bush, mother, Carolyn Fay Mitchell and Melbie Bush, sisters, Bennie Bush, Bobby Bush, and John Bush, brothers, Charles Bivens, half-brother, Willie Moody and Billy Moody, son. Willie Moody also claims damages for pecuniary losses and loss of consortium and services. Billy Moody claims damages for loss of parental support and guidance.

$238,334.00. She was 28 years of age at the time of her death. Her life expectancy was 50.9 years. Her work life expectancy was 22 years. She was earning $2.94 per hour, working a 40 hour week. Thus, the Court finds that this sum should be awarded as damages to the estate.

■ The estate incurred a funeral expense of $676.91. The medical bills totaled $2,018.46. The government does not contest the estate's right to recover these sums.

In regard to lost services, the government concedes that the estate is entitled to recover for lost services. However, the government challenges the calculation of an average of 41 hours per week in household services. In particular the government challenges the calculation of six hours per week between Mr. and Mrs. Moody for bill paying and two hours per week for Mrs. Moody expended going to the dry cleaners, above and beyond regular, normal shopping. Of these six hours, three were attributable to Mrs. Moody.

While the nature and procedure utilized by low income families for the payment of bills is by personal delivery of the money due, usually by cash payment, the Court is of the opinion that it is unreasonable to find that this family would require 25 hours per month for bill paying. Further, the Court is not persuaded that this family would require over eight hours a month for dry cleaning. Thus, a reduction of the hours is necessary.

■ From a review of the record as a whole, the Court concludes that an appropriate reduction of 10% of the total hours claimed in services is reasonable and fair. Therefore, the estate is entitled to recover the amount of $202,291.20 for loss of household services.

■ Mr. Moody testified from a hospital stretcher at trial. He was accompanied by two para-medical attendants. His testimony was not lengthy due to his illness. However, his testimony established that he did suffer more than the normal grief associated with the loss of a loved one. The government concedes that a reasonable award for mental anguish and loss of consortium is warranted. He saw his wife in her critical condition in the hospital in Camden. He followed her to Little Rock where she lingered for four additional days. Therefore, the Court concludes that an award of $100,000.00 for mental anguish to Willie Moody is reasonable and fair.

■ Billy Moody, the only child of Willie and Geraldine Moody, was only eight years of age at the time of his mother's death. He testified that he had some recollection of the incident. Billy is now attending Henderson State University in Arkadelphia, Arkansas. While some mental anguish is evident from his testimony, the Court is of the opinion that any recovery should be based primarily upon a loss of parental support. Billy was at that age where guidance, training and support from his mother was most critical. The Court concludes that an award of $75,000.00 for such loss is fair and reasonable.

■ Geraldine Moody was survived by her mother, Bessie Bush. Mrs. Bush went to Ouachita Hospital immediately upon learning of the incident. Mrs. Bush related the physical appearance of her daughter after the accident. Geraldine's skin was badly burned and swollen. There was what appeared to be skin on the floor around the bed. Geraldine "grunted and groaned" while Mrs. Bush was in the room. Mrs. Bush experienced mental anguish greater than normally associated with the loss of a loved one. The government concedes that Mrs. Bush is entitled to a reasonable award under this element of damage. The Court finds that the sum of $25,000.00 is a fair and reasonable award under the circumstances of this case.

■ The siblings of Geraldine Moody also claim mental anguish damages. However, the Court has heard the testimony of those present and is not persuaded that mental anguish damages are awardable to these family members. It is normal for a family to come together in the time of a death. It is normal for those living substantial distances away, such as Milwaukee, Wisconsin, to remain for more than a

day or two. The testimony received did not establish the close family ties that were present in the other cases heretofore considered. This family had become separate, independent units. The only factor present herein is the suddenness and violent nature of the death. The Court is of the opinion that this factor alone is not sufficient to support an award for mental anguish.

Therefore, the Court finds that Judgment should be entered for Willie Moody, Administrator of the Estate of Geraldine Moody, deceased, in the amount of $694,-120.57.

Separate Judgments shall be entered contemporaneously herewith for each estate.

### JUDGMENT

In accordance with the Memorandum Opinion entered herein this date and the Memorandum Opinion and Judgment entered herein on August 1, 1986,

IT IS THEREFORE CONSIDERED, ORDERED, AND ADJUDGED that plaintiff, Winfred Lowe, Administrator of the Estate of Thelma Lowe, deceased, is hereby awarded damages against the defendant United States of America in the amount of $59,523.57 on his complaint.