**Charles WILLIAMS, Administrator of the Estate of Don Williams, Deceased, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. LR–C–86–239.**

United States District Court, E.D. Arkansas, W.D.

May 7, 1987.

Richard L. Mays, Little Rock, Ark., for plaintiff.

Richard Pence, Asst. U.S. Atty., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

ROY, District Judge.

The plaintiff, Charles Williams, father of Don Williams, and administrator of his estate, brought this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, to recover for the wrongful death of his son. The case was tried to the Court without a jury.

Charles Williams is the natural father and administrator of the estate of Don Williams, deceased. He is a forty-six year old mechanic who, as a single parent, has had the primary responsibility for more than ten years of raising his two children, Don Williams, deceased, and Charles E. Williams, age 14. Charles and his ex-wife, Shirley Alexander, divorced in 1974 and she resides somewhere in Virginia. Don Williams had little or no contact with his mother or his sister during the last ten years of his life.

Don Williams, deceased, was a 16 year-old eleventh grade student at Little Rock Central High School and a cadet in the high school's Air Force R.O.T.C. program.

Don Williams was one of 49 high school R.O.T.C. cadets who attended the Junior R.O.T.C. Leadership School hosted by the Twenty-Second Air Force Non-Commissioned Officers Leadership School at the Little Rock Air Force Base from July 7 through July 12, 1985.

The high school students were invited by the Air Force R.O.T.C. program to participate in the summer leadership program. Invitations were extended to students at the R.O.T.C. programs of high schools in Arkansas and Oklahoma. The curriculum and training activities were planned and directed by the personnel of the Little Rock Air Force Base.

In order for Don Williams to participate in the Leadership Program held at the Little Rock Air Force Base, plaintiff, Charles Williams, signed an undated Student Data and Release form consenting to treatment in case of injury at the Air Force Hospital on the Little Rock Air Force Base and releasing the United States Air Force of any and all responsibility and/or liability for injury or death that might occur. Also, the cadets from Central High School were required to pay in advance Thirty Dollars ($30.00) which would cover the cost of their meals.

The United States Air Force operates an Airman's Pool at the Little Rock Air Force Base and employs lifeguards at the pool when the pool is opened to authorized patrons for swimming activities.

One of the activities of the R.O.T.C. Leadership School was a swimming party from 8:00 p.m. until 10:00 p.m. on July 9, 1985 at the Little Rock Air Force Airman's Pool. The Airman's Pool is 122 feet 2 inches long and 70 feet wide. It is 11 feet deep at its deepest point, and a rope divides the deep and shallow ends of the pool. The pool is rectangular in shape with the length of the pool running east and west. There is a three (3) meter high diving board at the center of the deep end of the pool, and a one (1) meter low diving board on each side. There are ladders on each side of the deep end of the pool for exit. The pool has a capacity of 210 persons. The pool has three lifeguard stands, two at each side of the deep end of the pool and one at the shallow end of the pool.

The Little Rock Air Force Base employs approximately five civilian lifeguards to provide for the safety of the patrons who utilize the pool. There is no chain of command among the lifeguards, and the manager of the pool has no lifesaver's training.

The local pool rules at the Airman's Pool provided that:

1. Divers must use the ladder to mount the diving boards;
2. Only one person is allowed on the diving board at a time;
3. Only one bounce on the end of the diving board is allowed;
4. Diving or jumping must be done from the end of the diving board;
5. Divers should not mount a ladder to use the high diving board until the previous diver has dived into the diving area;
6. Divers must wait for previous divers to move out of the diving area and toward the pool side ladder or exit point before diving;
7. Patrons must swim to the nearest ladder or exit point as soon as possible after diving;
8. Swimming in the diving area by patrons is not allowed.

The high school R.O.T.C. cadets arrived at the pool on July 9, 1985 between 7:00 p.m. and 7:20 p.m. while other patrons were still using the pool. The total number of patrons at the Airman's Pool at the time of the incident in question at approximately 7:30 p.m. is estimated to be between 80 to 100 patrons.

There were three lifeguards on duty. They were as follows: Jackie Pickels, age 18, in the high lifeguard stand on the north side of the deep end; Malcolm Koros, age 20, in the low lifeguard stand on the south side of the deep end; and Diane Lindsley, age 21, in a chair at the shallow end of the pool.

After arriving at the Airman's Pool, Don Williams and other cadets, including Theresa Hodge and Joe Don Looney, went off the high diving board three or four times without any difficulty or incident. Don Williams was at least an average swimmer and enjoyed swimming. On the final occasion that Don Williams went off the high diving board, he went off with his arms extended as in a "swan" dive. Theresa Hodge was next in line at the bottom of the high diving board and Joe Don Looney was waiting his turn behind her. No one saw Don Williams actually enter the water, and no one observed what happened to him under the surface of the water.

Theresa Hodge then went off the high diving board, and she was followed by Joe Don Looney. While diving off the board, Joe Don Looney thought he saw a person on the bottom of the pool, but was not sure. He swam to a ladder on the south side of the deep end, near the low lifeguard stand of Malcolm Koros, got out of the water, walked around to the edge of the pool by the high diving board and observed a body laying near the drain on the bottom of the pool. Joe Don Looney alerted Malcolm Koros, one of the lifeguards, and pointed the body out to him. Malcolm Koros didn't know if he saw Don Williams enter the water. After a brief conversation, Malcolm Koros left the guard stand and hurriedly went over to where Joe Don Looney was standing and then dived into the water to get Don Williams who was suspended just off the bottom of the pool in the diving area. Malcolm Koros lifted Don Williams from the bottom and surfaced with him asking for help from two or three individuals to lift Don Williams out of the pool.

The Court finds that more than two minutes passed between the point in time that Joe Don Looney began to mount the steps to start his dive and his notification of the lifeguard, Malcolm Koros, that Don Williams was at the bottom of the pool in the deep end. The Court also concludes that at least one minute passed between the time that Don Williams entered the water and Joe Don Looney mounted the ladder to begin his dive since Theresa Hodge followed Don Williams off the diving board.

After Don Williams was pulled out of the pool, Malcolm Koros went straight to the office and found someone already on the phone advising the hospital of the emergency. In the meantime, mouth-to-mouth resuscitation was first begun by Jackie Pickels, the other lifeguard in the deep end, approximately 20 seconds after she arrived to check for a pulse. She erroneously noti-

fied the other lifeguards that she thought she had a pulse and did not clear the airway before she began her C.P.R. Jackie Pickels had not worked as a lifeguard before she was employed by the Little Rock Air Force Base in the summer of 1985 and had been working for slightly more than a month when this incident occurred. The Court concludes that at least a minute passed and probably more after Don Williams was removed from the water before effective C.P.R. was started. The Court also concludes that it took the lifeguard at least 30 seconds to swim to the bottom, surface and remove Don Williams from the water.

Within four to seven minutes after Don Williams was pulled from the pool, the Air Force ambulance arrived and two attendants continued administering C.P.R.

Don Williams was taken to the Little Rock Air Force Base Hospital where a heartbeat was re-established, and he was later transported to the Arkansas Children's Hospital by ambulance.

As Don was being transported to the Children's Hospital, the ambulance carrying him was involved in a wreck. Although the tragic incident occurred at around 7:30 p.m., they did not arrive at Children's Hospital until approximately 11:00 p.m. Medical personnel at the Base hospital admitted that the Children's Hospital had more sophisticated and superior equipment to treat this particular problem. It appears if reasonable care had been exercised, Air Force personnel certainly could have gotten Don Williams to Children's Hospital more promptly.

On July 10, 1985 at approximately 6:40 p.m., Don Williams died as a result of brain damage he received from going without oxygen for approximately four minutes in connection with the near drowning incident.

The Government contends that the wrongful death claim is barred by an undated Student Data and Release form which Charles Williams signed as father of Don Williams in order for Don Williams to participate in the Leadership Program held at the Little Rock Air Force Base. The form gave Charles Williams' consent for Don Williams to attend the Air Force Junior Reserve Officer's Training of Corps Cadets Leadership School and for treatment in case of injury at the Air Force Hospital on the Little Rock Air Force Base. The form also stated:

In the unlikely event that ___Don___ is injured
(first name)
while participating in one of these activities, I give my consent for treatment at the U.S. Air Force Hospital at Little Rock Air Force Base and release all agencies and departments of the United States government (Department of Defense and U.S. Air Force), Little Rock Air Force Base, and all members of the United States Air Force and its civilian employees of any and all responsibility and/or liability for injury or death that might occur.

Participation in the Leadership School primarily served as a motivational vehicle to provide young high school students an appreciation for the quality of military life in order to enhance the likelihood of their enlisting after graduation from high school. If the program were over subscribed, only the best students were selected for participation. At Central High School, only those who paid Thirty Dollars ($30.00) in advance could participate.

Under Arkansas law, contracts exempting a party from liability for negligence are strictly construed and must be sufficiently clear and definite to express an intent to release one of the parties from liability for negligence. However, such unfavored agreements will not be enforced if they violate any rule of public policy. *Dessert Seed Co. v. Drew Farmers Supply, Inc.*, 248 Ark. 858, 454 S.W.2d 307 (1970). Under Arkansas law, agreements exempting a party from liability for negligence are not void *per se* and may be valid in appropriate circumstances. *Middleton v. Cato*, 251 Ark. 745, 474 S.W.2d 895 (1972); *Arkansas Power and Light Co. v. Kerr*, 204 Ark. 238, 161 S.W.2d 403 (1942).

No cases have been found in Arkansas in which agreements purporting to release a party from liability for his own negligence before it occurs have been upheld by the Courts. The rationale behind the numerous decisions invalidating so called releases given before liability arises is based upon

the strong public policy of encouraging the exercise of care. The courts also seek to protect persons from the effects of agreements which are rarely considered by the signor with the thoughtfulness and care appropriate to the catastrophic consequences which may occur. *See, Rogow v. United States*, 173 F.Supp. 547, 551–552 (S.D.N.Y.1959).

■ In the present case, not only is the language in the purported Release insufficient to apprise an unsuspecting parent of the conduct for which the government is seeking to eliminate liability, it fails to clearly indicate that the Government seeks to abandon responsibility for its own wrongful conduct. A custodian of a child who advises a parent of potentially hazardous activity in which his child may participate and receive injury through no fault of anyone does not by doing so effectively disclaim legal responsibility for injuries to the child that the custodian causes. In fact, the Government induces confidence of its care and custody by the use of such terms in the body of the Student Data and Release form as "supervised" activities and "in the unlikely event of injury". At the very least, a parent is led to suspect that a responsible custodian has the care and custody of his child. It is inconsistent for the Government to promise "supervised" activities and then disclaim liability when a child dies because he was lost to observation for an unreasonable period of time by those charged with responsibility of supervision.

Under the circumstances of this case, even if the language of the Release was sufficiently clear to absolve the government of liability for its negligent conduct, such an agreement would clearly be against the sound public policy of Arkansas. *See, Dessert Seed Co. v. Drew Farmer's Supply, Inc., supra.* To permit the Government to assume the care and custody of school children without an underlying policy encouraging the exercise of reasonable care would violate basic principles of fairness.

Since the plaintiff's claim is brought under the Federal Torts Claim Act, Arkansas law governs the substantive tort liability and the measure of damages which can be recovered. Arkansas law required that the plaintiff prove each of three essential elements:

1. That the defendant was negligent;
2. That the negligence of the defendant was the proximate cause of the death of Don Williams;
3. That the plaintiff and the statutory beneficiaries have sustained recoverable damages.

The plaintiff must establish each of these three essential propositions by a preponderance of the evidence. Preponderance of evidence means the greater weight of evidence. If the evidence appears to be equally balanced on any issue, the question must be resolved against the party who had the burden of proving it.

The defendant owed the duty to exercise ordinary care for the safety of pool patrons, but is not an insurer of the safety of pool patrons. *Industrial Park Businessmen's Club, Inc. v. Buck*, 252 Ark. 513, 479 S.W.2d 842 (1972). Ordinary care means the care a reasonably careful person would use under circumstances similar to those shown by the evidence in the case. Foreseeability is an element to be considered on the issue of negligence. To constitute negligence, an act or omission must be one from which a reasonably careful person would foresee an appreciable risk of harm to others. There is no negligence in failing to guard against a danger which cannot reasonably be anticipated. *St. Mary's Hospital, Inc. v. Bynum*, 264 Ark. 691, 573 S.W.2d 914 (1978); *Dollins v. Hartford Accident and Indemnity Co.*, 252 Ark. 13, 477 S.W.2d 179 (1972).

■ The plaintiff's evidence clearly establishes the negligence of the lifeguards in the present case. Although there were two lifeguards at the deep end, Jackie Pickels was clearly inexperienced and had been working as a lifeguard for slightly over one month. She was given responsibility without any supervision or adequate training and preparation for the emergency use of C.P.R. Her recall of the incident clearly indicates that she was inattentive to her duties. She testified that a small young

girl alerted Malcolm Koros to the presence of Don Williams at the bottom of the pool when the evidence clearly indicates that Joe Don Looney, a senior high school student, alerted Malcolm Koros. The evidence also indicates that she was sitting in her lifeguard chair engaging in conversation with Michael Gerogosian, a member of the United States Air Force Civil Engineer Staff, instead of giving her primary attention to the patrons entering the deep end of the pool from the diving boards. Jackie Pickels did not see Don Williams go off the board, and she testified that she saw Malcolm Koros get out of the water and lift Don Williams out of the pool when such statement is contradicted by other testimony. Furthermore, when Pickels went over to where Don Williams was being pulled out of the pool, she did not blow the whistle to stop the activity in the deep end.

The Court finds that Don Williams was lost to observation by the lifeguards for an unreasonable period of time. Although lifeguards were at their assigned duty stations, they were not attentive to the activities in the diving area of the pool.

In finding Malcolm Koros inattentive, the Court notes: (1) the testimony of Malcolm Koros that the water was very cloudy and a large crowd was in the deep end of the pool when other credible evidence indicates to the contrary; and (2) the testimony of Malcolm Koros that his last specific recall before this incident occurred was the ringing of a telephone which emphasizes his lack of concentration on the activities in the diving area that he was primarily responsible for observing.

Both Malcolm Koros and Jackie Pickels, the lifeguards who were stationed at the diving area, lost observation of Don Williams when he:

a. dived from the diving board;

b. entered the water; and

c. remained suspended under the water in the diving area for an unreasonable length of time.

Neither Malcolm Koros nor Jackie Pickels watched to see if Don Williams resurfaced before they permitted two other divers to enter the water from the high diving boards. The visibility in the water was adequate and at least the image of Don Williams' body was visible from the lifeguard stands of both Jackie Pickels and Malcolm Koros. The lifeguards' failure to observe the activities of Don Williams for several minutes was a proximate cause of his brain damage and resulting death. The inexperience of lifeguard Jackie Pickels and the lack of a requirement of a chain of command among the lifeguards to diminish the adverse impact of such inexperience increased the time that Don Williams went without effective C.P.R.

Although the failure of Malcolm Koros to observe Don Williams was not totally clear from the facts, it is clear that his mind was on a telephone ringing and noise over near the fence instead of on the patrons in the pool. He also concedes that at least a dark patch of Don Williams' body was visible from his lifeguard stand. Although no one knows what happened to Don Williams after he entered the water, it is clear that this lack of knowledge comes directly from a lack of observation by the two lifeguards.

It is also just as clear that the two lifeguards failed to adhere to standard pool rules previously enunciated and testified to by Luther Armstrong, the plaintiff's expert with over 28 years of lifeguard experience.

Mr. Armstrong indicated that the lifeguard should moderate the use of the diving area, observe each person as he or she enters the diving area, and check to make sure each diver surfaces before another diver is permitted to enter the diving area. Furthermore, the only time a lifeguard should leave his station without blowing the whistle is when another guard relieves him. Otherwise, a guard should always blow the whistle when leaving the station. Since Don Williams was found at the bottom of the diving area, it is clear that he never surfaced before other divers went off the diving board. It is also clear that at least one minute passed after Don Williams dived off the board before Joe Don Looney mounted the ladder to begin his dive since Theresa Hodge followed Don Williams off the diving board. Joe Don

Looney estimates that slightly more than two minutes elapsed between the point that he mounted the ladder to start his dive and the time that he notified the lifeguard of Don Williams' body at the bottom of the pool. Although Malcolm Koros testified that it only took 15 seconds to retrieve Don Williams from the bottom of the pool, the Court is not required to set aside its common sense. If it took Jackie Pickels 20 seconds to start C.P.R., it would have taken Malcolm Koros more than 30 seconds and possibly a minute to enter the water, surface with Don Williams, swim to the poolside and wait for Don Williams to be lifted from the water.[1] The evidence is also sufficient to establish that at least one additional minute passed before effective C.P.R. was administered to Don Williams. Under these circumstances, the evidence clearly preponderates in favor of a finding that the lifeguards lost observation of Don Williams for an unreasonable period of time and were, therefore, negligent.

■ The Government contends that Don Williams died because of lack of oxygen to the brain due to aspirated water in his lungs, not because of the length of time he was deprived of oxygen under the surface of the water. The Government contends that because of the aspirated water in Don Williams' lungs, nothing could have been done to provide sufficient oxygen to the brain and prevent hypoxic brain damage. It is argued, therefore, that more prompt recovery and emergency resuscitation would not have preserved the life of Don Williams. The Government advanced its position through the testimony of its Air Force doctor, James G. Laurenzano. Dr. Laurenzano based his testimony primarily on the blood gas readings which were taken when Don Williams arrived at the Air Force Hospital. Since the blood gas readings revealed below normal oxygenation of the blood while Don Williams was receiving 100 percent oxygen, the Air Force doctor concluded that C.P.R. was ineffective in delivering enough oxygen to prevent brain damage. The Government's contention be-

comes less persuasive when met with the fact that 80 to 90 percent of drownings are wet drownings or drownings with aspirated water, most of which involve victims who have been resuscitated by the effective use of C.P.R. Moreover, the victim in this case, Don Williams, was in fact resuscitated and adequately ventilated even after a considerable time lapse.

In contrast to the Air Force doctor's testimony, the plaintiffs presented the rebuttal testimony of Dr. Debra Fiser of the Arkansas Children's Hospital who also treated Don Williams. Dr. Fiser testified that more prompt recovery probably would have affected the clinical outcome of Don Williams in this instance. She testified that even with a 25 percent loss of capacity from aspirated water in the lungs, effective C.P.R. still would have introduced enough oxygen into Don Williams' body to affect the neurological outcome. She calculated the quantity of oxygen that would have been delivered through C.P.R. to Don Williams under the circumstances at 300 milliliters of oxygen per minute and testified that a normal person walking around would only use approximately 250 milliliters of oxygen per minute. Dr. Fiser's testimony clearly demonstrated that more prompt recovery and emergency resuscitation would probably have made a difference in the final outcome in the Don Williams case.

The evidence clearly establishes that Don Williams was without oxygen for approximately four minutes and probably more. The evidence also establishes that the lifeguards were not attentive, lost Don Williams to observation for an unreasonable period of time and were not enforcing their own pool rules relating to the use of diving equipment when the incident occurred. The record indicates that permanent brain damage can occur between two and four minutes if the body is completely without oxygen and that Don Williams was without oxygen for at least such a period of time. Whatever happened to Don

1. The Court recognizes that the exact time frame cannot be established and Don Williams

could have been under water longer than these estimates.

Williams under the water[2], the Court can only conclude that had the recovery been prompt, Don Williams could have been resuscitated without brain damage since he was resuscitated with brain damage, brain damage so severe that it ultimately caused his death.

With respect to damages, the parties have stipulated as to the amount of the medical and funeral expenses ($5,587.62). What remains at issue is the amount that plaintiff should recover for mental grief. Plaintiff contends that the testimony presented to the Court establishes entitlement to an award of damages for Charles Williams in the amount of Two Hundred and Fifty Thousand Dollars ($250,000.00) and for Charles E. Williams in the amount of Sixty-Five Thousand Dollars ($65,000.00). Defendant contends that if the Court finds defendant is liable and that plaintiff and his younger son are entitled to recover damages for mental anguish, damages to Charles Williams in the range of $20,000.00 to $60,000.00 and to Charles E. Williams in the range of $7,000.00 to $12,500.00 would be appropriate.

Statutory beneficiaries such as a father and son of the decedent are entitled to recover for mental grief as long as it is "more than the normal grief" experienced upon the loss of a loved one. *Fountain v. Chicago R.I. & P. Ry.* 243 Ark. 947, 422 S.W.2d 878 (1968); *See St. Louis S.W. Ry. Co. v. Pennington,* 261 Ark. 650, 677, 553 S.W.2d 436, 449 (1977). In *St. Louis Southwestern Railroad Co. v. Farrell,* 242 Ark. 757, 416 S.W.2d 334 (1967), the Arkansas Supreme Court made an effort to clarify the "more than the normal grief" language by stressing the necessity of showing exceptional circumstances or a particular relationship between the damaged recipient and the deceased to sustain an award for mental grief.

A recent Arkansas state court case involving an award in a wrongful death of minor children is the case of *Stull v. Ragsdale,* 273 Ark. 277, 620 S.W.2d 264 (1981), in which the Supreme Court sustained the award of Forty-Nine Thousand Dollars ($49,000.00) to a father for the wrongful death of his four-year old daughter. In *Scoville v. Missouri Pacific Railroad Co.,* 458 F.2d 639 (8th Cir.1972), the Eighth Circuit Court of Appeals sustained an award by Arkansas Federal District Court of Sixty Thousand Dollars ($60,000.00) to the mother for the wrongful death of an 18-year old child and Fifty Thousand Dollars ($50,000.00) for the wrongful death of an eight-year old child. In that same case, an award of Twelve Thousand Five Hundred Dollars ($12,500.00) was sustained by the sister for the loss of her 18-year old brother and Seven Thousand Five Hundred Dollars ($7,500.00) was sustained by the brother and sister of the eight-year old. In *Norman v. Gray,* 238 Ark. 617, 383 S.W.2d 489 (1964), the Supreme Court sustained an award of Thirty-Five Thousand Dollars ($35,000.00) to each parent for the loss of a 12-year old daughter. In a recent case decided by Judge Oren Harris in the Western District of Arkansas, *Lowe v. United States of America,* 662 F.Supp. 1089 (W.D.Ark. 1987), Judge Harris discussed the factors to be considered in awards for mental anguish:

> The Arkansas Supreme Court has distilled some thirteen factors which are utilized in evaluating awards for mental anguish in wrongful death cases. The factors are:
>
> (1) The duration and intimacy of their relationship and the ties of affection between the decedent and the survivor;
>
> (2) Frequency of association and communication between an adult survivor and an adult decedent;
>
> (3) The attitude of the decedent toward the survivor and of the survivor toward the decedent;
>
> (4) The duration and intensity of the sorrow;
>
> (5) Maturity or immaturity of the survivor;
>
> (6) The violence or suddenness of the death;
>
> (7) Sleeplessness or troubled sleep over an extended period;

---

2. An autopsy was not performed.

(8) Obvious extreme *or* unusual nervous reaction to the death;

(9) Crying spells over an extended period of time;

(10) Adverse effect on survivor's work or school;

(11) Change of personality of the survivor;

(12) Loss of weight by survivor or other physical symptoms; and

(13) Age and life expectancy of the decedent.

*See Martin v. Rieger*, 289 Ark. 292, 711 S.W.2d 776 [ (1986) ]; cited in *Kelley v. Wiggins, Administrator*, 291 Ark. 280, 724 S.W.2d 443 (1987).

The Court notes from the outset of its consideration of the death cases that a primary factor existing in each case is the suddenness and violent nature of the deaths. However, this factor is not sufficient, standing alone, to support an award of damages for mental anguish. *Id.*, 1095.

In that case, Judge Harris gave awards for mental anguish in amounts ranging from $5,000.00 to $100,000.00.

Surviving Don Williams was his father, Charles Williams; a brother, Charles E. Williams, age 14; a mother, Shirley Alexander Williams, who resides in Virginia; and a sister, Cheryl P. White, who resides in Milwaukee, Wisconsin. Don Williams, the decedent, and his brother, Charles E. Williams, have lived with their father, Charles Williams, since July, 1974. As indicated earlier, Charles Williams and Shirley Alexander Williams divorced in 1974, and neither party has remarried. Don Williams had little or no contact with his mother, Shirley Alexander Williams, or his sister, Cheryl P. White, during the last ten years of his life.

Charles Williams, the father of Don Williams, has suffered exceptional mental grief as a result of the loss of his oldest son, Don Williams. Charles Williams was extremely close to his son, Don Williams, having the responsibility of raising him without the presence of a mother in the home and taking time to engage in fishing and sporting activities with him and his younger brother. The Court is impressed that the family not only worshipped together every Sunday, but that all three, Mr. Williams, Don and Charles, were involved in all church activities such as participating on the Usher Board. The intimacy of the relationship, the natural ties of affection as well as the suddenness and unexplained circumstances of the death of Don Williams precipitated a crisis in Charles Williams' life necessitating the professional intervention of a clinical psychologist to assist him in attempting to maintain a stable mental outlook. Charles Williams has sometimes lost total emotional control and "cried like a baby" during his sessions with his clinical psychologist. The Court finds that the need for professional psychological support for Charles Williams will probably be necessary for at least another year. There was testimony that he had lost time from work, had difficulty sleeping and had become more introverted, hostile, antagonistic and paranoid since the loss of his son. The record reflects that Charles Williams has incurred burial expenses and substantial medical expenses as a result of the July 9, 1985 drowning incident.

The Court finds that Charles E. Williams, the younger brother of Don Williams, has suffered exceptional mental grief as a result of the loss of his brother, Don Williams. Don and Charles became very close after their mother and father separated. Charles E. Williams became dependent upon Don for guidance and material and psychological support. His aunt, Mary Williams, testified that she noticed a significant difference in behavior in Charles Williams after the loss of his brother. She testified that Charles Williams was extremely dependent upon his older brother, Don Williams, since they did not have a mother in the house. She testified that Don Williams would cook, clean up, wash clothes and do those things for Charles Williams which a mother would ordinarily do. She testified that Charles was still emotionally distraught about the loss of his only brother and was not able to visit the

bedroom in which they lived without being severely upset and distressed.

Reverend Edwards testified that Charles was much less outgoing, although he did notice in the recent past some improvement. The evidence is overwhelming that the relationship and the bond of affection between the two young brothers was exceptional. The suddenness of death and lack of preparation by an immature survivor produce a duration and intensity of sorrow and grief that will affect young Charles for many years to come.

The Court is aware that care should be taken in a diversity case to see that damage awards do not exceed those which could be sustained were the case before the Supreme Court of the state whose substantive law gives rise to the claim in suit. *Scoville, supra,* 458 F.2d at 648. However, as also stated in *Scoville,* each case must be evaluated as an individual one, within the framework of its distinctive facts, "with some recognition being given the continuing erosion in the purchasing power of the dollar." *Scoville, supra,* 458 F.2d at 648.

 Under the circumstances of this case, an award of $100,000.00 to an aggrieved father for the loss of his 16–year old son certainly does not appear to be unreasonable in the context of the more recent awards which have been sustained in other cases for the loss of a minor child. The special nature of the relationship between Mr. Williams and his deceased son has been amply demonstrated by the testimony of Mr. Williams, his sister-in-law, and his psychologist, Dr. Alda Moore. The evidence establishes that exceptional mental grief has not only been experienced for more than a year and a half since the death of Don Williams by his father, Charles Williams, but is likely to be experienced in the future. An award of $50,000.00 to the brother of Don Williams, Charles E. Williams, is amply supported by the testimony relating the special and dependent relationship existing between these two brothers. The request of Five Thousand Five Hundred and Eighty-Seven Dollars and Sixty-Two Cents ($5,587.62) for the es-

tate is well documented by exhibits admitted into evidence by stipulated agreement.

In conclusion, in awarding damages for the loss of a minor child, the courts have had the responsibility of grappling with the facts and assessing the issue of damages in the context of relatively abstract and nebulous standards. The courts recognize that placing monetary value on mental grief is not an exact science and imposes the responsibility on the factfinder to scrutinize the facts for those exceptional circumstances which assist in converting human grief to a monetary value. No court likes to contemplate the imponderable, and the value of a lost child is an imponderable. Assessing value of the exceptional grief that a parent experiences when a child is lost through the wrongful conduct of another requires a recognition that no monetary award can make a parent whole, but a monetary award is all that justice can impose.

An award of $155,587.62 under the circumstances of this case reflects a sensitivity to the intense human emotion experienced by the claimant in this case without unduly punishing the tortfeasor.

Based upon the foregoing, a judgment will be entered awarding the plaintiff a total of $155,587.62.